Argued July 2, reversed November 21, petition for rehearing
denied December 18, 1962

# VENDRELL *v.* SCHOOL DISTRICT NO. 26C,
# MALHEUR COUNTY
### 376 P. 2d 406

[ 1 ]

*James A. Cox,* Ontario, and *Roland F. Banks,* Portland, argued the cause for appellant. On the brief were Yturri, O'Kief & Cox, Ontario, and Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

*Wendell Gronso,* Burns, argued the cause for respondent. On the brief were Cramer & Gronso, Burns.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by the defendant, School District No. 26C of Malheur County, from a judgment in the amount of $25,000 which the circuit court entered against it in favor of the plaintiff based upon a jury's verdict. The defendant school district lies in Malheur County and includes the city of Nyssa and more particularly Nyssa High School which it operates. August 24, 1953, a week before classes assembled in the high school, the plaintiff registered for football practice and play. He shortly enrolled in the school as a freshman. October 9, about six weeks after he had turned out for football and while playing as a member of the Nyssa High School team against the Vale High School team, he sustained the injury mentioned in

*Vendrell v. School District No. 26C, Malheur County,*
et al, 226 Or 263, 360 P2d 282. He was the plaintiff
in that action. The action now before us and the one
just cited are based upon substantially the same com-
plaint. Following the announcement of the decision
just mentioned the complaint was amended by adding
an additional charge of negligence and omitting all
defendants except the school district. Since the acts
of negligence, if any were established by the evidence,
were those of the football coaches, the defendant's
liability, if any, must be based upon the doctrine of
respondeat superior.

The defendant-appellant presents the following as
its assignment of error:

"The court erred in denying defendant's motions
for a nonsuit and a directed verdict. The motions
and the court's rulings are as follows: * * *."

With three members dissenting, our former opinion
ruled that since the defendant had obtained a policy
of liability insurance as authorized by ORS 332.180,
an action based upon charges of negligence could be
maintained against it with recovery limited to the
amount of the policy ($25,000). It also sustained the
sufficiency of the complaint as the statement of a
charge of negligence.

The present complaint, in charging the defendant
with negligence, avers that at the time of the plaintiff's
injury (1) he was "an inexperienced football player";
(2) he weighed 140 pounds; (3) he was "not physically
coordinated" (4) his injury befell him when he was
"tackled hard by two Vale boys"; (5) he had not
received "proper or sufficient instructions"; and (6)
he had not been furnished with "the necessary and
proper protective equipment" for his person. The

latter is the new charge which the third amended complaint added to the averments of negligence. The complaint also alleges that the plaintiff's injuries "were directly and proximately caused by the negligence of the defendant." The answer denied all allegations of negligence and of proximate cause. It alleged that (1) if any of plaintiff's protective equipment was improper or insufficient the fact was known to him, (2) he did not advise the defendant thereof, and (3) his neglect in that respect constituted contributory negligence upon his part. It further alleged that (a) the plaintiff knew that football was a body contact sport, (b) he willingly entered into it, and (c) he assumed its risks. The reply denied all new matter alleged in the answer. It averred that (1) the plaintiff "was never informed by the defendant as to the uses of protective equipment"; (2) the plaintiff was not informed of the dangers of playing football with ill fitting, improper equipment; (3) the defendant did not possess a sufficient quantity of equipment to enable the players to obtain properly fitting gear, and (4) the defendant "had never explained the risk and hazards incidental to a football game, nor had defendant or its agents ever explained the full nature of the game of football to this plaintiff, or the hazards involved therein."

The part of our former opinion that is particularly material to the issues now before us states:

"* * * A coach or physical education instructor is required to exercise reasonable care for the protection of the students under his supervision. Bellman v. San Francisco H. S. Dist., 11 Cal2d 576, 81 P2d 894 (1938); La Valley v. Stanford, 272 App Div 183, 70 NYS2d 460 (1947). * * * We hold that the allegation that plaintiff was allowed to participate in a varsity football game without proper or

sufficient instruction is sufficient to state a cause of action against the district. * * *"

We must therefore determine whether the evidence presented in this case showed that the defendant's coach failed "to exercise reasonable care for the protection of his players," and if so, whether the injury which the plaintiff sustained resulted therefrom.

Before entering Nyssa High School the plaintiff had completed the course of study offered by Nyssa Junior High School. The latter maintains a football team, two coaches and scheduled games. While a student in that school the plaintiff had constantly been a member of its football team. He played the position of left half-back, the same position that he was playing at the time of his injury.

Nyssa High School has about 300 students, two football coaches and a manager for the team. It played scheduled games with other high schools. The plaintiff was 15 years of age when he entered the high school—one year older than most pupils.

The plaintiff sustained his injury during the close of the fourth quarter of a game in which Nyssa's opponent was the Vale High School team. He was injured when he was tackled by two Vale players while he was carrying the ball.

As a witness the plaintiff described as follows what happened: "And I saw the Vale players in front of me and I knew I couldn't go any further so I put my head down and just ran into 'em and that is when I heard my neck snap." At that moment he suffered the injury for which he seeks redress in damages. It consists of a fracture of the fifth cervical vertebra of the neck.

We shall now consider the plaintiff's specifications of negligence, one by one.

The first specification of negligence states that when the plaintiff was injured he was "an inexperienced football player." We believe that the word "inexperienced" should be given its common meaning. We generally speak of a person as experienced who has acquired knowledge upon the matter in hand through training or practical contact with it. An inexperienced person is one who is lacking in those elements and is, therefore, deficient in capacity to do the work which is about to be undertaken. Experience varies with individuals and the type of activity in which they engage. One person's experience may have extended over many years. Upon the other hand, the experience of a high school football player, even if we count his days of training, can be no more than a few months.

Thomas D. Winbigler, football coach of the Bend High School and a witness for the plaintiff, saw the Nyssa-Vale game and the play in which the plaintiff sustained his injury. Referring to that play and the plaintiff's handling of it, he testified:

"It was a well-executed play. I will say that. Any play that will go for that much yardage is a well-executed play."

Before the plaintiff had turned out on August 24, 1953, for football practice he had played for two years as a member of the football team of Nyssa Junior High School. Evidently, the training given to the football squad in the junior high school is substantial, for we note that the plaintiff mentioned that the squad was taught how to tackle, block, stiff-arm, carry the ball and keep the ball from the opponent. While a member of the junior high school football team the plaintiff played in games against Adrian, Vale, Payette, and Parma.

Before any student was accepted as a member of the Nyssa High School football squad it was necessary for him to be pronounced physically fit by a physician and for his parents to give their written consent. The plaintiff met both requirements. The plaintiff had worked in the preceding summer upon farms and deemed himself in good condition. More than one of the witnesses spoke of him as a promising football player, and none referred to him in any other way. He concedes that he was generally the first member of the squad present for football practice and the last to leave the training field.

Football practice was conducted every afternoon, Monday through Thursday, for about two hours. No practice was maintained on Fridays because that was the day upon which the team played its games.

The training for football play which the plaintiff, as a member of the Nyssa High School football squad, underwent was, of course, dependent somewhat upon the competency of the school's coach. All other coaches who mentioned the subject described Nyssa's head coach, Howard Lovelace, as competent and well regarded. Thomas D. Winbigler, aforementioned, was the football coach of Weiser High School in 1953 but at the time of the trial was the football coach of Bend High School. He testified:

"I have a high regard for Howard in his ability to coach and his teams were well coached. * * *"

The training of the squad consisted of a program of calisthenics, classes on physical conditioning and training rules. The calisthenics were intended to strengthen the body. One of them was called bull-neck exercise. It was engaged in for several minutes each day and was designed to strengthen the neck. The

plaintiff described it as hard. The training program was also intended, so the plaintiff said, to enable the players to learn the plays and the fundamentals of football such as tackling, running, blocking and the proper position of the head and body while in play. We observe that the players engaged in scrimmage, line play, dummy tackling, and backfield movements. The plaintiff conceded that the coaches stressed the necessity for each player to learn "the fundamentals of football" and told them that otherwise they could not enjoy the game or play it successfully. The coaches stated that calisthenics, training and hard work were essential for self-protection. The players were instructed in the manner of gaining protection from blows and taking them on their protective equipment. Mr. Winbigler, the witness for the plaintiff whom we have mentioned, testified that the defendant's program of drills, practice and exercises was proper and adequate. He also expressed the belief that the Nyssa High School team was well coached.

The plaintiff practiced, so he testified, "most of the time" with what he termed the "varsity" team. He attended every practice session. Since in junior high school he played the position of left half-back, the same as in the senior high school, he conceded that when he was injured he was playing that position for the third year. His testimony upon that subject was:

"Q  So this was your third year in that particular position?

"A  Yes."

Before the plaintiff played in the game against Vale he had played (1) in the preceding two year period in several games as a member of the football team of Nyssa Junior High School, (2) as a member of the Nyssa High School's "A" team for a few plays

against the John Day High School team, and (3) as a member of Nyssa High School's "B" team in games against Ontario, Parma, and Vale.

The foregoing indicates that the plaintiff had undergone extensive training, practice and play under competent instruction and supervision. The question now occurs, do these facts permit a finding that he was, upon the occasion of his injury, "an inexperienced football player"? One more contention must be considered. The plaintiff claims that the Vale team was powerful and that it contained many players of outstanding skill. Before the plaintiff entered the game in the fourth quarter the score was 48 to 0 in Vale's favor. The Vale team believed that with that score it could not lose the game, and, accordingly replaced virtually all of its best players with substitutes. One of its players, Kay Smith, who was a sophomore and left half-back, testified as a witness for the plaintiff that at the time of the plaintiff's injury, "we had most of our freshmen and sophomore players in the ballgame." He added, "They were pretty close evenly matched," that is, the two teams that were then in the field. Smith was one of the players who tackled the plaintiff.

■ Without further analysis of the evidence, we express our belief that it cannot warrant a finding that the plaintiff was "an inexperienced football player" at the time of his injury.

The second specification of negligence mentions the fact that the plaintiff weighed 140 pounds. Smith, Vale's half-back who tackled the plaintiff and whom we just mentioned, weighed 130 to 135 pounds. Don Savage, a witness for the plaintiff, was a junior in Nyssa High School and, like the plaintiff, was a left half-back upon its team. He played in the Vale-Nyssa

game. When he was taken out of the game the plaintiff replaced him. He weighed, so he swore, "125 to 130 pounds" at that time. Dirk Rhinehart, another backfield player upon the Nyssa team, weighed 120 pounds. The record does not indicate the weight of other players. However, Mr. Winbigler, whom we have mentioned, testified:

" And I believe you said that on a man-to-man basis, the Vale and Nyssa teams were pretty much equal—about the same?

"A That's right."

We have also quoted the testimony of Kay Smith that at the time of the plaintiff's injury the players in the field were substantially the equal of one another.

■ We do not believe that the plaintiff's weight could furnish the basis for a finding of negligence upon the defendant's part.

■ The third specification of negligence states that the plaintiff was "not physically co-ordinated." The only evidence upon that score that we have been able to find is the following which was given by the aforementioned Don Savage who was a member of the Nyssa football team at the time of the plaintiff's injury.

"Q Will you describe his physical co-ordination and how he handled himself, generally?

"A Well, he was a pretty fast boy. He was—ah—not too awkward, but he certainly wasn't as well co-ordinated as some of the other members of the team—the older ones.

"Q What do you mean in 'co-ordinating'? Will you describe it?

"A Well, I mean the way that he would run with the ball and things of that nature."

No other witness was questioned upon the subject of "co-ordination." The plaintiff made the outstanding gain of the game for Nyssa and Mr. Winbigler, a witness for the plaintiff, swore that the run in which he made the gain was a well executed play. We do not believe that Mr. Savage's testimony indicates any negligence upon the defendant's part.

■ The fourth specification of negligence is that the plaintiff was "tackled hard by two Vale boys." That specification refers to the tackle of the plaintiff by the Vale players which ended his excellent yardage gain. The record does not show that the tackle was unusual or that the Vale players were guilty of any irregularity. The plaintiff saw the tacklers charging upon him and realized that he could not escape them. One of the tacklers (Smith) was to the side and rear of the plaintiff. The other tackler (Carl Gustafson) came from the front. He came into contact with the plaintiff before Smith did. He did not attend the trial and his weight is not disclosed by the record.

If the plaintiff, as he faced the tacklers, noticed anything unusual in the situation, he did not mention the fact as a witness, nor did he testify that the tacklers employed uncommon force. The fact that the plaintiff was "tackled hard by two Vale boys" establishes no negligence upon the defendant's part.

■ The sixth specification of negligence which we will consider before we proceed with the fifth, contends that the plaintiff had not been furnished with "the necessary and proper protective equipment" for his person.

A day after August 24 when the plaintiff enlisted for football practice, the protective equipment was distributed to the players. The manager supervised its allotment and the coaches were present. The equip-

ment consisted of helmets, shoulder pads, rib pads, and hip pads together with the uniforms. The quantity was larger in amount than the number of players. The gear was placed upon tables and the lettermen were given first choice. Next came the seniors and finally the freshmen, of whom the plaintiff was one. The plaintiff testified that after he had chosen the equipment he wanted, "I just took it to my locker and put it on." He added, "Whatever didn't fit, I'd bring it back and try—until I'd get the right deals and the right equipment." A part of his complaint seems to be based upon the incident that although the coaches in some other schools helped their players fit their equipment, Nyssa's coaches did not do so. The Nyssa coaches were present, however, when the players made their selections and tried on their equipment. The plaintiff did not testify that he needed help in order to determine whether the gear which he chose fitted him. The helmet which he selected in August was discarded several weeks later when he split it in a game by running head-on into an opposing player. He then returned to the equipment room and selected another helmet. Concerning it he said, "It was just a little bit loose." He admitted that he did not try on all of the available helmets before he took the one that "was just a little bit loose," but described as "old" the helmets which he did not try on. He also testified that one of his shoulder pads was loose because the string which was intended to draw it into a snug position was broken and therefore too short. Other strings were readily available. The two complaints just mentioned are the only ones that the plaintiff voiced concerning his equipment. He made no claim that his equipment was defective, nor did he find any fault with his uniform. Uncontradicted evidence indicates that the defendant

had an agreement with a concern whereby all of the equipment was regularly inspected; defective parts were discarded and replaced with new. The plaintiff conceded that he did not mention to the manager, the coaches, or any other school representative the fault that he found with his gear. He also conceded, as we have noticed, that he had the privilege of returning any of his equipment and of selecting a substitute. He testified that when he played in a game, such as the Nyssa-Vale game, he wore a jersey and that since it fitted tight it held the shoulder pad well in place. When this case was here the first time the complaint did not aver any shortcoming in the protective equipment. A charge of that kind was not made until the third amended complaint was filed—more than seven and one-half years after the injury occurred. We have studied the evidence with care and have found no indication that the plaintiff's equipment, if it was not proper, had any bearing upon the happening of his injury.

■ If it was in any way unsuitable to the plaintiff's needs he was intimately familiar with that fact and voluntarily decided to proceed. This, we believe, is a proper case in which to employ the rule denoted by the phrase Volenti non fit injuria. Harper and James, Torts, § 21.2; Prosser on Torts, p. 303; *Hunt v. Portland Baseball Club,* 207 Or 337, 296 P2d 495.

The fifth specification of negligence presents the contention that the plaintiff did not receive "proper or sufficient instruction." We infer that the quoted words were intended to mean that the defendant's coaches (1) did not instruct the plaintiff adequately in the manner of playing the game of football, (2) should have told him that in playing football he might sustain injury, and (3) should have told him that if

he lowered his head and used it as a battering ram injury to his spine might ensue.

The playing of football is a body-contact sport. The game demands that the players come into physical contact with each other constantly, frequently with great force. The linemen charge the opposing line vigorously, shoulder to shoulder. The tackler faces the risk of leaping at the swiftly moving legs of the ball-carrier and the latter must be prepared to strike the ground violently. Body contacts, bruises, and clashes are inherent in the game. There is no other way to play it. No prospective player need be told that a participant in the game of football may sustain injury. That fact is self evident. It draws to the game the manly; they accept its risks, blows, clashes and injuries without whimper.

No one expects a football coach to extract from the game the body clashes that cause bruises, jolts and hard falls. To remove them would end the sport. The coach's function is to minimize the possibility that the body contacts may result in something more than slight injury. The extensive calisthenics, running and other forms of muscular exercise to which the defendant's coaches subjected the defendant's squad were intended to place the players in sound physical condition so that they could withstand the shocks, blows and other rough treatment with which they would meet in actual play. As a further safeguard for the players' protection the defendant provided all of the players with protective equipment. Each player was taught and shown how to handle himself while in play so that a blow would fall upon his protective equipment and not directly upon his body. We have also noticed the fact that every player was instructed in the manner of (1) running while carrying the ball, (2) tackling an

opposing player, and (3) handling himself properly when about to be tackled. For example, the plaintiff testified:

"Q Now, if you wouldn't stiff-arm properly, or run properly, with your tail down and your legs underneath you, with your head up and your back straight, wouldn't the coach point this out to you? Wouldn't he work with you and discuss these matters with the various backs?

"A Yes, he did.

\* \* \*

"Q At any time, in your coaching by Mr. Lovejoy or Mr. McGinley, were you ever told that you should either strike a dummy or an opposing player with your head?

"A No, but, see, I had done it in practice. In actual scrimmage. I had done that very same thing in practice—in scrimmage and nobody had ever told me any different."

The purpose of the extensive instructions and arduous practice was to enable the player not only to make for his team the maximum yardage but also to reduce to the minimum the possibility that an injury would befall him.

All of the football coaches who testified upon the subject swore, as we have seen, that the instructions and practice which were given to the defendant's football squad were adequate and were similar to that which they gave to their own players. No criticism was offered of the instructions and practice. Had the plaintiff followed the instructions that were given to him about holding his head up, his injury would not have occurred, assuming, of course, that the failure to hold up his head was the cause of his injury.

But the plaintiff says that the defendant's coaches had not told him that if he used his head as a battering

ram an injury might befall him. One of the first lessons that an infant learns when he begins to toddle about on his feet is not to permit his head to collide with anything. Not only do his parents, playmates and teachers unite in teaching him that lesson, but every door, chair and other protruding object that is in the child's presence becomes a harsh but effective teacher that injury occurs if he bumps his head upon something. Less than two weeks before his lamentable injury befell him, the plaintiff was taught the lesson again that he had learned in his infancy. This time it was taught to him when he ran head-on into a player in the Parma game and split his head gear. When he discarded his ruined helmet and borrowed one from a team mate he saw from the split helmet in his own hands what could have happened to his head. No coach could have spoken to him more effectively.

■ The defendant was not the plaintiff's employer or his master. Its coaches were his teachers. He had the right—in fact, the duty—to ask the coaches questions concerning any matter which was not clear, 38 Am Jur, Negligence, § 191, page 868. In turn, the coaches had the right to assume that he possessed the intelligence and stock of information of a normal young man, Harper and James, The Law of Torts, § 16.5, page 913. Thus, they had the right to assume that he knew of the possibility of injury that comes to an individual who uses his head as a battering ram.

There is no express testimony in the record that the plaintiff struck anyone with his head. He swore that he lowered his head when he saw that he was about to be tackled, but neither he nor anyone else testified that he struck anyone with his head. The manner in which the play was made in which the plaintiff received his injury is left in doubt. At first plain-

tiff's witness, Kay Smith, created the impression that he was the first Vale player that tackled the plaintiff a moment before he (Smith) did. Then the following occurred:

"Q If it should turn out that John Wilcox said that he was the other player involved in the tackle, would that be possible?—

"A It could have been.

"Q You aren't sure that it was Gustafson at all.

"A Yes, I'm positive Carl Gustafson was there. In fact, I know he was there. Carl was there. Now, as far as John being there, now, John could have been in on that play because Wilcox is just one— there was ball players all over."

Neither Wilcox nor Gustafson was produced as a witness. It is impossible to discern from the record the manner in which the injury occurred. It may be that a Vale player's knee or shoulder struck the plaintiff's head.

We take the following from Harper and James, The Law of Torts, § 21.5, page 1181:

"Voluntary participants in lawful games, sports, and even roughhouse, assume the risk of injury at the hands of their fellow participants (and of course of 'hurting themselves'), so long as the game is played in good faith and without negligence. * * *"

Prosser on Torts, page 307, states:

"* * * Those who participate or sit as spectators at sports and amusements assume all the obvious risks of being hurt by roller coasters, flying balls, fireworks, explosions, or the struggles of the contestants. 'The timorous may stay at home.' * * *"

The following is taken from a comprehensive annotation which appears in 7 ALR2d 706 entitled "Liability for injury to or death of participant in game or contest."

"Summarizing the decisions, without at this point going into a detailed consideration of the underlying theories and reasoning, it appears that generally a participant in a lawful game or contest assumes the dangers inherent in that game or contest with consequent preclusion from recovery for injury or death resulting therefrom.

■ We believe that the plaintiff assumed the risk attendant upon being tackled. The risk of injury that was inherent in being tackled was obvious. The plaintiff was thoroughly familiar with it. He had been tackled scores of times and had been the tackler many many times. The tackle in question was made fairly and according to the rules.

■ We believe that the defendant's coaches gave to the football squad adequate, standard instruction and practice. The record does not indicate that the defendant's coaches negligently omitted any detail; certainly it does not establish that the defendant's coaches omitted to perform any duty alleged by the complaint. As we have said, we believe that the plaintiff assumed all of the obvious risks of which tackling was one.

The defendant's motion for a directed verdict should have been sustained. The assignment of error reveals merit. The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment for the defendant.