841 A.2d 869

**Tara KELLY, et al.**

v.

**His Eminence, Theodore Cardinal McCARRICK, Catholic Archbishop of Washington, and his Successors in Office, A Corporation Sole, d/b/a The Catholic Archdiocese of Washington, D.C., et al.**

**No. 2114, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Feb. 5, 2004.

84

Alan S. Albin, Cedar Knolls, NJ, for appellant.

William Carter (Kevin M. Murphy, Carr Maloney, PC, on the brief), Washington, DC, for appellee.

Panel: JAMES R. EYLER, ADKINS, CHARLES E. MOYLAN JR. (Retired, specially assigned), JJ.

ADKINS, Judge.

Softball requires each athlete to take the field ready to perform the plays that are necessary for the team to win. One thing that veteran ballplayers and fans know, long before the opening pitch, is that there are dangers on the base path. That is illustrated by this case of 13 year old St. Mark's Parish second baseman Tara Kelly, whose ankle fractured when a St. Joseph's Parish player slid into her as she made the tag.

Seeking to revive their $10 million lawsuit, Tara and her parents, Daniel and Terry Kelly, ask us to reverse the grant of summary judgment in favor of all five defendants/appellees: St. Mark's Parish; St. Joseph's Parish; Phillip John Welch, manager of the St. Joseph's team; the Catholic Archdiocese of Washington, D.C. (the Archdiocese); and the Catholic Youth Organization (CYO). Restated, the Kellys' contentions are that the Circuit Court for Prince George's County erred in disregarding evidence supporting inferences that Tara was injured as a result of:

I. "Coaching" failures in training players and coaches to safely execute the slide and tag-out play, and in matching players of uneven skill;

II. Failure to equip the diamond with "breakaway bases" that might have prevented Tara's injury; and

III. Improper care of Tara in the aftermath of the on-field collision.

As to the first and second liability theories, we agree with the circuit court that the Kellys assumed the risks of Tara's injury, as well as the risk of playing on a field with stationary bases. As to the third theory, we see nothing in the summary judgment record to suggest that the injuries for which the Kellys seek compensation resulted from any breach of the defendants' duty of care to Tara after her injury. We shall affirm the judgments.

## FACTS AND LEGAL PROCEEDINGS

### The Injury

Tara was hurt in an April 22, 1997 fast pitch softball game at St. Joseph's Parish. She was playing second base for the St. Mark's Parish 7th and 8th grade team in a CYO league. In the bottom of the first inning, with no outs, St. Joseph's was already beating St. Mark's badly. According to Tara, Amy G., a good player for St. Joseph's, hit the ball, rounded first, and headed for second base. Amy slid into the base feet first, colliding with Tara, who made the tag for the first out of the inning.[1]

Tara's right foot had been positioned on the back corner of the stationary base, which was anchored by a stake into the ground. She placed it along the side toward first base, but left most of the base open along the base path, so that she did not obstruct Amy's path. In the collision, Tara's ankle was severely fractured.

Terry Kelly, Tara's mother, was watching the game. She had just arrived and was in the process of setting up her chair when she looked out on the field, just in time to see Amy G. sliding into second. Tara and Terry both described Amy's slide as curved instead of straight.

Although Tara's ankle was not bleeding and the break was not compound, it was immediately identified as a serious injury. As Tara recalled it, after a just "couple of minutes,"

---

1. Other accounts of the play differed from Tara's. Mrs. Kelly testified in her deposition that Amy had not hit the ball, but was trying to steal second from first. Mrs. Kelly also recalled that the umpire called Amy safe. Phillip Welch, the St. Joseph's manager who was coaching third base, also testified that Amy was trying to steal from first base, and that he had given her the steal sign. Patricia Brady, Tara's coach, did not recall whether Amy had batted or was stealing from first. We find any factual dispute regarding whether Amy was stealing from first or trying to stretch a hit into a double immaterial to the issues raised in this appeal, because the salient and undisputed fact is that Amy slid into second base. *See Scroggins v. Dahne*, 335 Md. 688, 690–91, 645 A.2d 1160 (1994)(disputes regarding facts that will not affect the outcome of the case do not foreclose summary judgment).

she was carried from the field by Coach Welch from St. Joseph's and a woman whom she did not know.[2]

Terry Kelly, in an effort to get Tara to the hospital as quickly as possible, brought her car up next to the field. Tara was carried five or six more steps to the car, then driven by her mother to the emergency room at the National Naval Medical Center in Bethesda.[3] After three surgeries, Tara has intermittent pain and some activity limitations as a result of the injury.

## The Litigation

The Kellys filed a nine count complaint against CYO, St. Joseph's Parish, its coach, and St. Mark's Parish, as well as the Archdiocese of Washington, under whose supervision the parishes and their staffs work. The counts included negligence allegations that the defendants failed to train players and coaches how to safely play softball, failed to ensure that Tara's team was not scheduled to play against teams with more skilled players, failed to equip the field with breakaway bases that may have prevented Tara's injury, and failed to ensure that coaches and volunteers were trained to handle emergencies involving game injuries. Extensive discovery ensued.

Tara testified at her deposition that she loved playing sports. She regularly followed and watched professional baseball. Tara's grandfather was a professional baseball player, and her father occasionally played softball. She knew "the rules of softball," including that she had to tag the runner with the ball to make the out. She did not "remember ever being told it, but [she] knew the rule" because she had "kind of

---

**2.** Welch testified in deposition that the woman who assisted him was a nurse. She was present at the game because she was the wife of his assistant coach and mother of a St. Joseph's team member.

**3.** Patricia Brady, the St. Mark's coach, testified in deposition that "people asked Mrs. Kelly to let them call—not to put her in the car, to call an ambulance."

grown up with baseball" and "the rules are very similar" to softball.

Before her injury, Tara had played CYO softball the three previous years, and T-ball before that. She "[m]ainly" played second base and shortstop. She liked softball and considered herself a good player. She was on St. Mark's "A" team in both her seventh and eighth grade years. That year, the St. Mark's team was one of the average teams in the league, not the worst, but not the best.

Later, in an affidavit opposing summary judgment, Tara declared that she was

never trained by [her] softball coach, Mrs. Brady, in the "rules of softball" and did not know the actual rules of softball. This is apparent since I thought I had to keep my foot on the base in order to tag out a runner. It is clear that I was given the wrong instruction on how to tag out a runner sliding into second while avoiding the runner.

Daniel Kelly, Tara's father, testified at his deposition that he was not at the game when Tara was injured. But he was the St. Mark's Parish softball commissioner at that time. He had watched some of the St. Mark's practices, and hit ground balls for the players. He recounted that one of St. Mark's coaches taught Tara how "to get a foot and one corner" of the base. Tara also learned "[t]o reach into the base to tag out and there should be no problem."

Tara's coach, Patricia Brady, testified at her deposition that she considered the CYO league to be for "developmental instruction," "participation," and "fun." She described Tara as "one of the better skilled" players on the St. Mark's team.

With respect to instruction and training, Brady explained that she "work[ed] with [her] infield girls .... a lot[,]" and specifically coached Tara in how to play second base. Brady's daughter, who played second base on her high school softball team, also "had come ... at least on two occasions specifically to work with Tara" on fielding at second base.

One constant and transcending lesson was "not to block the base," which Brady taught to avoid injury. In addition, Brady coached Tara "to stand either in front of the base, behind the base, or . . . on the side of the base where the runner would not be coming." When asked whether she "train[ed] her, in terms of how she would know where the runner was going to be coming," Brady replied, "No, I did not. I don't think that's a skill that needs to be trained." In her view, the "element of risk" involved in fielding against a sliding base runner was a matter that "everybody knows" as a matter of "common sense[.]"

Thomas Manco, director of CYO programs, testified in deposition that, "[u]nder the rules, the batter/runner has the right to reach the base without obstruction by the fielder." The rules in use for the CYO league stated that "[r]unners are never required to slide," but also provide that a base runner is required to "legally attempt to avoid a fielder in the immediate act of making a play on her." Sliding is one common way to do so.

Phillip Welch coached both the St. Joseph's team and a "select" team in a different competitive league called the "Marylanders." The Marylanders team was not affiliated with CYO or any of the parishes. Tara recalled that one of her St. Mark's teammates and another of her St. Mark's classmates played for the Marylanders. After she was injured, Tara also came to believe that Amy G. was on the Marylanders; Welch, however, testified that she was not on his Marylanders team that year.

Welch instructed his players to slide "[a]ny time there is a play at the bag that they are going to," for "[s]afety reasons." He pointed out that "[t]he alternative is the two girls running into each other, versus sliding into the base." Welch told his team that sliding "was mandatory" because "National High School Federation rules require you to slide into a bag . . . at any time during a play at any bag. You cannot go in and run over a player at a bag or you're automatically thrown out of the game." He "spent hours on sliding drills[,]" telling the

players that "the sliding was for their safety, as well as the other player." He taught them to go into the bag with their lead foot, which in Amy's case was her right foot. Welch told her that she should "[a]lways" aim for the bag. He "[n]ever" told his players that they were allowed to try to knock the fielder down.

The Circuit Court for Prince George's County granted summary judgment on all counts to all defendants. As to the negligent training and mismatch claims, the court concluded that "a person of normal intelligence, in a similar position as [the Kellys], would clearly have comprehended the danger" in tagging out a sliding base runner. Citing Tara's four years in softball and her "normal intelligence," the court held that

> [t]he issue of whether [Tara] had knowledge of the danger and appreciated that risk, and thus, assumed the risk is for the Court.... [The Kellys] clearly understood the risk of injury by participating in softball and especially when Tara Kelly positioned herself in front of or in the path of a runner that could result in a collision. Contact between a runner and the base defender is a risk incidental to the game of softball, which is obvious and foreseeable. Furthermore, sliding is a part of softball....
>
> [The Kellys] had knowledge of the risk of collision and injury, appreciated that risk and voluntarily participated and permitted Tara Kelly to expose herself to that risk by participating in the softball game.

As to the negligence and premises liability claims relating to the use of stationary bases, the court also held that the Kellys had assumed the risk of playing on field with them. Even "[a]ssuming the use of the non-breakaway bases created a dangerous condition[,]" the stationary staked bases "were open and visible and available for inspection."

With respect to the negligent training in emergency care claim, the court concluded that the Kellys "failed to present admissible evidence of negligence" to show either that "the [d]efendants breached their duty of care in the manner in which Plaintiff Tara Kelly was treated after sustaining an

injury" or that Tara's "injuries were worsened when she was removed from the field or thereafter." [4]

The Kellys noted this appeal, in which they challenge the judgments on their training, mismatch, breakaway bases, and emergency care claims.[5]

## DISCUSSION

### Assumption Of The Risk

 "Assumption of the risk negates the issue of a defendant's negligence by virtue of a plaintiff's previous abandonment of his or her right to maintain an action if an accident occurs." *McQuiggan v. Boy Scouts of America,* 73 Md.App. 705, 710, 536 A.2d 137 (1988). The concept

> is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk.... "[The defense] rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk."

*Crews v. Hollenbach,* 358 Md. 627, 640–41, 751 A.2d 481 (2000) (citations omitted). Thus, if the plaintiff "(1) had knowledge of

---

4. The court did not address whether appellee Welch had statutory immunity from negligence liability. *See, e.g.,* Md.Code (1974, 2002 Repl.Vol., 2003 Cum.Supp.), § 5–406, § 5–407, § 5–802 of the Courts & Judicial Proceedings Article (limiting personal liability for certain agents and volunteers and officials of charitable, recreational, athletic, and civic organizations). *See generally* Howard P. Benard, *Little League Fun, Big League Liability,* 8 Marq. Sports L.J. 93 (1997)(advocating immunity legislation and a liability scheme other than ordinary negligence for volunteer coaches); Jamie Brown, *Legislators Strike Out: Volunteer Little League Coaches Should Not Be Immune from Tort Liability,* 7 Seton Hall J. Sports L. 559, 580–81 (1997)(opposing immunity based *inter alia* on the availability of insurance).

5. The circuit court also granted summary judgment on the Kellys' claims for intentional infliction of emotional distress and for reimbursement of medical expenses. The Kellys have not challenged the judgment on the intentional infliction claim (Count IX).

the risk of danger, (2) appreciated that risk and (3) voluntarily exposed himself to it[,]" then assumption of the risk has been established. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 630, 495 A.2d 838 (1985) (citation omitted); *see McQuiggan,* 73 Md.App. at 710, 536 A.2d 137.

Whether a risk has been assumed in a particular situation is measured by an objective standard.[6] *See ADM P'ship v. Martin,* 348 Md. 84, 91, 702 A.2d 730 (1997); *Saponari v. CSX Transp., Inc.,* 126 Md.App. 25, 32, 727 A.2d 396, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999). " '[A] plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him.' " *ADM P'ship,* 348 Md. at 91, 702 A.2d 730 (citation omitted). "Although the

---

6. Assumption of the risk frequently is described as either "primary" or "secondary," although the Court of Appeals has decided assumption of the risk cases without finding it necessary to adopt that distinction. *See Crews v. Hollenbach,* 358 Md. 627, 641–42, 751 A.2d 481 (2000). Because many decisions do discuss these concepts in examining assumption of particular sports risks, an understanding of the distinction is helpful.

The distinction arises from both the source and the effect of an assumed risk. Either a reasonable plaintiff understood and agreed that the defendant had no duty to her in the particular circumstances that gave rise to the injury (primary assumption), or alternatively, the plaintiff deliberately chose to accept the known risk that the defendant might behave in the manner that caused her injury (secondary assumption). *See id.* at 641–42, 751 A.2d 481. The "no duty" rationale for primary assumption of the risk generally arises from a "judicially-crafted public policy . . . . designed to limit the duty of care that the public owes to certain classes of plaintiffs." *Id.* at 642, 751 A.2d 481; *see also Turcotte v. Fell,* 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964, 968 (1986)(assumption of the risk in this sense is based on plaintiff's consent to relieve defendant of a legal duty to protect him from certain future sports risks). The alternative "voluntary exposure" rationale for secondary assumption of the risk focuses on the individualized factual question of whether this particular plaintiff knowingly and voluntarily exposed herself to the danger that culminated in her injury. *See Crews,* 358 Md. at 641, 751 A.2d 481. *See also Knight v. Jewett,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 708 (1992)(explaining that focus in primary assumption of the risk cases is not whether the plaintiff's conduct in choosing to encounter the risks of the game was reasonable, but "whether, in light of the nature of the sporting activity . . ., defendant's conduct breached a legal duty of care to plaintiff").

question of whether the plaintiff assumed the risk is normally for the jury, if it is clear that an individual of normal intelligence, in the plaintiff's position, must have understood the danger, then the issue is for the court." *Saponari,* 126 Md.App. at 32, 727 A.2d 396; *see ADM P'ship,* 348 Md. at 91–92, 702 A.2d 730; *Schroyer v. McNeal,* 323 Md. 275, 283–84, 592 A.2d 1119 (1991).

Assumption of the risk principles apply to children as well as adults. *See Bliss v. Wiatrowski,* 125 Md.App. 258, 273, 724 A.2d 1264, *cert. denied,* 354 Md. 571, 731 A.2d 970 (1999); *McQuiggan,* 73 Md.App. at 710–12, 536 A.2d 137. Like adults, children are held to an objective standard, albeit one reflecting the child's age, mental capacity, experiences, and circumstances.[7] For example, in *McQuiggan,* we held that a 12 year old boy assumed the risk of an eye injury that occurred shortly after he decided to stop playing a rubberband-paper clip shooting game with his friends. *See McQuiggan,* 73 Md.App. at 711, 536 A.2d 137. In doing so, we recognized that "there is no doubt that a child of that age can assume the risk of his or her actions." *Id.*

In *Bliss v. Wiatrowski,* we approved the following jury instructions in a case involving a 16 year old passenger's negligence claim against the intoxicated driver with whom she accepted a ride:

> [A]ssumption of the risk ... may bar recovery by a guest passenger of a drunken driver, who knows or should know

---

**7.** We reject the Kellys' suggestion that the assumption of risk standard for children is subjective. The Kellys misunderstand our observation that " 'no very definite statement can be made as to just what standard is to be applied to [children].' " *See McGarr v. Boy Scouts of America,* 74 Md.App. 127, 135, 536 A.2d 728 (1988)(quoting Prosser & Keeton, *Law of Torts* 179 (5th ed.1984)). We did not intend by that statement to change the objective standard for assumption of the risk by a child that we recognized in *McQuiggan v. Boy Scouts of America,* 73 Md.App. 705, 536 A.2d 137 (1988). In that case, decided just before *McGarr,* we affirmed summary judgment on the ground that the child assumed the risk as a matter of law even though he subjectively decided to stop playing the dangerous game before he was injured. *See id.* at 711, 536 A.2d 137.

of the driver's condition, if the driver's negligence, due to intoxication, is the cause of the accident causing injury.... A child, however, is not to be held to the same standard or degree of care that an adult would have used.... **A child should be deemed to have assumed the risk if another child of similar age, intelligence, experience and development, would have acted differently, under the same circumstances.**

*Bliss,* 125 Md.App. at 273–74, 724 A.2d 1264 (emphasis added). These instructions "accurately set[ ] forth the separate standard of care for minors." *Id.*

### Assuming Sports Risks

Among the dangers commonly cited to illustrate assumption of the risk concepts are the physical risks intrinsic to the sport of baseball. *See, e.g.,* Prosser & Keeton, *The Law of Torts* § 68, at 488 (5th ed. 1984)("There are some things, as for example the risk of injury if one is hit by a baseball driven on a line, which are so far a matter of common knowledge in the community, that in the absence of some satisfactory explanation a denial of such knowledge simply is not to be believed"); *Yount v. Johnson,* 121 N.M. 585, 915 P.2d 341, 345 (App. 1996)("A baseball can be hit or even thrown with bone-crushing velocity. Rules permit hard sliding, even the occasional close pitch. It is all part of the game, and its contours are commonly understood, whether in the stadium or in the sandlot").

But softball and baseball players do not assume **all** risks of injury simply by participating in a game. *See McQuiggan,* 73 Md.App. at 711, 536 A.2d 137. With respect to athletes injured during play, the general rule is that " '[a] voluntary participant in any lawful game, sport or contest, in legal contemplation by the fact of his participation, assumes **all risks incidental to the game, sport or contest which are obvious and foreseeable.**' " *Nesbitt v. Bethesda Country Club, Inc.,* 20 Md.App. 226, 232, 314 A.2d 738 (1974)(quoting 4 Am.Jur.2d § 98)(emphasis added). Thus, the risks assumed by participating in a game are only the "usual" and foresee-

able dangers that a similarly situated player reasonably would expect to encounter during that game. *See McQuiggan,* 73 Md.App. at 711, 536 A.2d 137. These foreseeable dangers include risk of injury resulting from the type of physical contact that is an integral part of the sport as it is typically played. *See Hammond v. Bd. of Educ. of Carroll County,* 100 Md.App. 60, 69–70, 639 A.2d 223 (1994).

We have applied these principles in cases involving a variety of injuries incurred during voluntary games. *See, e.g., id.* (general rule supported summary judgment against 16 year old girl severely injured during contact football scrimmage); *McQuiggan,* 73 Md.App. at 712, 536 A.2d 137 (affirming summary judgment against 12 year old who assumed risk of eye injury during rubberband-paper clip shooting game); *Nesbitt,* 20 Md.App. at 232, 314 A.2d 738 (rule supported summary judgment against 15 year old golfer who assumed risk of injury during driving range practice). The Kellys, however, have eschewed the "negligent play," "negligent supervision," and "failure to warn" claims that we addressed in those cases, in favor of negligent training, matching, and equipping claims. Moreover, instead of suing her coach or the player who injured Tara, the Kellys sued only the St. Joseph's coach, the parishes who sponsored the two teams, the CYO league, and the Catholic Archdiocese, which is the sponsoring organization for the CYO league and the two parishes. The Kellys contend that, even if they assumed the risk of injury resulting from negligent play, they could not have assumed the risk of injury from failing to adequately instruct players and coaches how to avoid this type of sliding injury, failing to match players of similar skill, or failing to use the safer breakaway bases.

We found no Maryland precedent considering assumption of the risk, or the "no duty" principles underlying that concept, in the "negligent coaching" context. In *Hammond,* we did recognize the viability of an assumption of risk defense to a negligent coaching claim. In that case, we affirmed summary judgment against the family of a 16 year old girl who was permanently injured while playing in her first varsity football scrimmage. *See Hammond,* 100 Md.App. at 70, 639 A.2d 223.

Although the Hammonds had signed a written consent and waiver form permitting their daughter to play on the boys' team, they claimed that the waiver was invalid because school officials failed to adequately warn them about the risk of such a serious injury. We rejected that claim, observing that " 'the law does not make a school the insurer of the safety of pupils at play[,]' " and that "courts have been extremely inhospitable to claims that properly equipped, injured ... players should be able to recover from school officials for injuries sustained during an ordinary, voluntary contact sport game." [8] *Id.* at 66–67, 639 A.2d 223 (citation omitted).

We also emphasized what is obvious to anyone who plays and watches sports—that many games **require** physical contact between opposing players, so that participants are presumed to know that " 'there is no other way to play' " without some risk of physical injury during such contact. *See id.* at 66–67, 639 A.2d 223. "[P]ermeating the sports injury cases is the recognition that '[p]hysical contact in ... an athletic contest is foreseeable and expected.' " *Id.* (quoting *Albers v. Indep. Sch. Dist. No. 302 of Lewis County,* 94 Idaho 342, 487 P.2d 936, 939 (1971)). Moreover, "it is 'common knowledge that children participating in games ... may injure themselves and ... [that] no amount of supervision ... will avoid some such injuries[.]' " *Id.* (quoting *Brackman v. Adrian,* 63 Tenn.App. 346, 472 S.W.2d 735, 739 (1971)). Because playing voluntary sports is a matter of individual choice, anyone who may be "weak, slow, disabled, etc." can avoid the obvious dangers in playing the game by choosing not to participate. *See id.* at 65 n. 2, 639 A.2d 223.

Although we were not asked to consider a negligent coaching theory of liability, we did acknowledge that the same assumption of risk principles applicable to "negligent play" claims asserted against another player have also been applied to negligent coaching claims. *See id.* at 66, 639 A.2d 223. We

---

8. Although it appears that Terry Kelly signed a medical emergency form before Tara began play that season, the grant of summary judgment here did not depend on that document.

cited "numerous [out-of-state] cases in which minors injured while playing in school sporting events have sued school officials (or others similarly situated) asserting that the officials' negligence caused the participant's injuries," including cases involving "inadequate instruction or training" and "inadequate or improper supervision" by coaches. *See id.* at 65–66, 639 A.2d 223.

## I.

### Negligent Coaching

The Kellys complain that the circuit court erred in granting summary judgment on their various "negligent coaching" claims, which we view as falling into two related but distinct aspects of coaching duties categories—negligent training and negligent mismatching.[9] In Count 1 of their amended complaint, the Kellys allege that Tara was not trained in how to tag out a runner sliding into second base. In Count II, the Kellys claim that the Archdiocese, CYO, and both parishes negligently failed to train their coaches, volunteer staff, and others so that they in turn could "properly train players such as Plaintiff Tara Kelly in correct procedures to play softball[.]" In Count IV, they contend that the same defendants negligently failed to ensure that Tara's team "was assigned to play other teams and other players of reasonably comparable age, skill, size, strength, experience, training, and level of competitiveness" to Tara and the St. Mark's team.

Before examining the Kellys' arguments with respect to these claims, however, we wish to underscore what we are **not** considering here:

---

**9.** *See generally* Anthony S. McCaskey & Kenneth W. Biedzynski, *A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries,* 6 Seton Hall J. Sports L. 7, 15 (1996)("Prevalent case law and legal commentary establish the following specific duties upon coaches: (1) supervision; (2) training and instruction; (3) ensuring the proper use of safe equipment; (4) providing competent and responsible personnel; (5) warning of latent dangers; (6) providing prompt and proper medical care; (7) preventing injured athletes from competing; and (8) matching athletes of similar competitive levels").

- First, we are not addressing mandatory sporting activities, such as those that might occur in a school physical education class or a professional sport.[10]

- Second, we do not address injuries incurred as a result of off-field conduct that is not an intrinsic part of the sport, such as, for example, injury resulting from a coach's negligence in driving players to the field.

- Third, we do not address injury resulting from an intentional or reckless act by another coach, such as a coach's instruction to a base runner to execute an illegal take-out slide that presents a clear safety threat to the fielder.[11] Whether a player assumes the risk of "flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose," *Turcotte v. Fell,* [68 N.Y.2d 432, 510 N.Y.S.2d 49] 502 N.E.2d 964, 970 (N.Y.1982[1986]), is simply not presented by this case.

---

**10.** *Cf. Hammond v. Bd. of Educ. of Carroll County,* 100 Md.App. 60, 65 n. 2, 639 A.2d 223 (1994)("different considerations may apply when an injury occurs during compulsory physical education classes rather than during voluntary participation in school athletic contests"); Thomas R. Hurst & James N. Knight, *Coaches' Liability for Athlete's Injuries and Deaths,* 13 Seton Hall J. Sports L. 27, 29–32 (2003)(discussing worker's compensation considerations in professional sports injury cases); *Brown v. Nat'l Football League,* 219 F.Supp.2d 372, 377–90 (S.D.N.Y.2002)(addressing collective bargaining, federal preemption, and arbitration issues raised by professional athlete's suit against league).

**11.** We have not been directed to any evidence in this summary judgment record from which it reasonably can be inferred that Amy was instructed or encouraged to intentionally slide into Tara in an effort to prevent her from making the play (*i.e.,* to execute a take-out slide). Indeed, the Kellys have not asserted such a claim against Amy or her family. *Cf. Kiley v. Patterson,* 763 A.2d 583, 586–87 (R.I.2000)(evidence that base runner slid into second with his feet high above the base in an effort to break up a double play made summary judgment in favor of runner inappropriate); *Ross v. Clouser,* 637 S.W.2d 11, 13–14 (Mo.1982)(evidence that base runner who saw he was going to be tagged out dove head first directly at third baseman while he was 12 feet off the base and six feet outside base path made summary judgment inappropriate); *Bourque v. Duplechin,* 331 So.2d 40 (La.Ct.App.), *cert. denied,* 334 So.2d 210 (1976)(evidence that base runner ran full speed at second baseman standing five feet outside base path supported judgment for fielder).

● Fourth, because the grant of summary judgment rested solely on assumption of the risk principles, we need not decide whether evidence of "merely negligent" coaching that falls short of intentional, reckless, or grossly negligent behavior is actionable under Maryland law.[12]

## Coaching Liability

As we noted, Maryland has no reported case law considering a negligent coaching claim. We see no reason that assumption of the risk principles applicable to negligent play claims should not also apply to negligent coaching claims. We agree that "the same general standard should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she . . . failed to provide adequate instruction

---

**12.** The majority view is that a claim for personal injury incurred during a voluntary athletic competition may not be premised on mere negligence, but only on intentional or reckless acts or omissions. *See generally* Stanley L. Grazis, *Liability of Participant in Team Athletic Competition for Injury or Death of Another Participant*, 55 A.L.R.5th 529, *2 (1998 & 2003 Supp.)(discussing cases); Carla N. Palumbo, *New Jersey Joins the Majority of Jurisdictions in Holding Recreational Sports Co-Participants to a Recklessness Standard of Care*, 12 Seton Hall J. Sports L. 227, 228–38 (2002)(same). As the California Supreme Court has explained,

> [t]he overwhelming majority of the cases . . . have concluded that it is improper to hold a sports participant liable . . . for ordinary careless conduct committed during the sport—for example, for an injury resulting from a carelessly thrown ball or bat during a baseball game—and that liability properly may be imposed on a participant only when he or she intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport.

*Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 716 (1992); *see also Southwest Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 271 (Tex.2002)(discussing three "models of liability" and recognizing that "[a] majority of courts have adopted a 'reckless or intentional' standard"). This limitation on liability is often justified on the policy grounds that active and vigorous participation in recreational sports should not be discouraged by threats of litigation arising from "ordinary careless conduct." *See Knight*, 11 Cal.Rptr.2d 2, 834 P.2d at 716; *Allen v. Dover Co-Recreational Softball League*, 148 N.H. 407, 807 A.2d 1274, 1284–85 (2002); *Schick v. Ferolito*, 167 N.J. 7, 767 A.2d 962, 968–69 (2001); *Gauvin v. Clark*, 404 Mass. 450, 537 N.E.2d 94, 96–97 (1989).

or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student." *Kahn v. East Side Union High Sch. Dist.*, 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d 30, 32 (2003). Similarly, these standards also govern analogous negligence claims based on "mismatching" athletes and teams.

In a leading assumption of sports risk case, the New York Court of Appeals described the general duty for those involved in sporting events, as a limited duty

> to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty. Plaintiff's "consent" is not constructive consent; it is actual consent implied from the act of the electing to participate in the activity.

*Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964, 968 (1986)(citing Prosser & Keeton, *Law of Torts* § 68 (5th ed.)(1984); 4 Harper, James & Gray, *Torts* § 21.1 (2d ed.); *Restatement (Second) of Torts* § 892[2] ).

Other courts and commentators generally concur that "[c]oaches must be aware of preventable risks to their athletes and they must take measures to properly supervise and care for their players[,]" but that athletes nevertheless "shoulder a formidable burden in establishing a coach's negligence in relation to these duties." Thomas R. Hurst & James M. Knight, *Coaches' Liability for Athlete's Injuries and Deaths*, 13 Seton Hall J. Sports L. 27, 37 (2003)(collecting and discussing cases). In practice, liability of coaches and athletic leagues has been restricted to instances in which the alleged misconduct not only directly resulted in injury, but also reflected an unusual disregard for a player's well-being. *See generally id.* (reviewing cases and concluding that "[it] appears that a showing short of . . . serious misconduct" amounting to "inattention, ignorance and indifference to a player's well-being . . . . will probably not sustain a plaintiff's suit for a coach's negligence").

When evaluating whether an athlete assumed risks attributable to coaching, courts have given substantial weight to the dangers of the sport in concluding that the plaintiff assumed its inherent risks. *See generally id.* at 39–41 (discussing inherent risk as critical factor in assumption of sports risk cases). "In the sports setting ... conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." *Knight,* 11 Cal.Rptr.2d 2, 834 P.2d at 708; *see, e.g., West v. Sundown Little League of Stockton, Inc.,* 96 Cal.App.4th 351, 116 Cal.Rptr.2d 849, 851 (2002)("Losing a fly ball in the sun and being hit by it is an inherent risk of baseball assumed by all players whether it happens during little league warm-ups or during Game 7 of the Major League World Series"). One of the dangers inherent in any sport is that instruction and training may not be able to eliminate certain risks that are inherent in playing the sport.

For example, in *Foronda v. Hawaii Int'l Boxing Club,* 96 Hawai'i 51, 25 P.3d 826, 845 (App.), *cert. denied,* 2001 Haw. LEXIS 245 (2001), a Hawaii court rejected a negligent coaching claim on behalf of a boxer who died after falling out of the ring during a sparring match. The court observed that the "hard reality" in that sport is that

> even the best of coaching and supervision cannot make the risk of falling and injuring oneself anything but inherent.... Nor can it preclude the risk that a boxer can be seriously injured, or killed, before his coach and trainer can do anything to prevent it; indeed, before they can even be aware that the fighter is in trouble. And it certainly cannot prevent two people who are hitting each other, even if only in practice, from becoming "heated up." ... **All of these risks are inherent in the sport. Said another way, [the decedent] assumed the risk that coaching and supervision cannot guarantee against injury while boxing.**

*Id.* (emphasis added).

As in cases involving participant liability, most courts addressing coaching liability claims also consider the plaintiff's knowledge and experience in the sport. *See* Hurst & Knight,

*supra,* 13 Seton Hall J. Sports L. at 41–43. "[T]he more experience the plaintiff has in the sport, the more likely it is that he made an informed judgment regarding the inherent risks." *Id.* at 42; *see, e.g., Vendrell v. Sch. Dist. No. 26C,* 233 Or. 1, 376 P.2d 406 (1962)(affirming judgment in favor of coach and school district because experienced high school football player assumed risk of neck injuries during tackle); *cf. Morgan v. New York,* 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202, 205–06 (1997)(affirming summary judgment because experienced bobsledder assumed the risk of crash injury).

Some courts also have cited policy reasons for limiting coaching liability to circumstances in which a coach increases the inherent danger of a sport, so that coaches may not be held liable for failing to decrease risks inherent in the game. In California, where sports law concerning assumption of inherent risks has been developed through case law, the Supreme Court has held that "a sports instructor or coach owes a duty of due care not to increase the risk of harm inherent in learning an active sport[.]" *Kahn,* 4 Cal.Rptr.3d 103, 75 P.3d at 39.

> [A]s a matter of policy, it would not be appropriate to recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events. Accordingly, defendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport, although they generally do have a duty not to increase the risk of harm beyond what is inherent in the sport.

*Id.* at 103, 75 P.3d at 38.

For example, in *Balthazor v. Little League Baseball, Inc.,* 62 Cal.App.4th 47, 72 Cal.Rptr.2d 337, 340–41 (1998), a California appellate court held that a baseball league did not have a duty to decrease the inherent baseball risk of being hit by a wild pitch. The court concluded that the league had not increased the inherent risk of harm by failing to end the game as sunset approached, or by failing to remove a pitcher who

had previously hit batters, since changes in lighting conditions are inherent in the game and requiring pitching accuracy would "alter the fundamental nature of the game and most certainly chill vigorous participation." Similarly, the *Foronda* Court observed "[t]he coaching and supervision during the fatal accident did not ... create a new risk or exacerbate an inherent risk." *Foronda,* 25 P.3d at 845.

## A.

### Negligent Instruction And Training

The Kellys argue that "[t]he court made a fundamental logical and legal error in holding that by participating in the softball game for which she and [Amy were] inadequately prepared/trained ..., Tara or her parents 'assumed the risk' of the consequences of that inadequate and negligent training." In their view, a young infielder like Tara cannot assume the risk of being injured by her own improper fielding techniques, or by the base running of an opponent, when that conduct resulted from a coach's negligent failure to train these players in how to safely handle a contested play at second base. We disagree.

As a threshold matter, we are not persuaded that there was a material dispute about what the Kellys knew and appreciated regarding the danger of injury. That the Kellys may not have anticipated the precise nature, severity, or source of Tara's injury is immaterial if a reasonable person would have known and appreciated that injury could occur in the manner that it did.[13] *See McQuiggan,* 73 Md.App. at 711, 536 A.2d

---

13. In any event, the record does not support the Kellys' contention that Tara's injury was unanticipated. The only evidence submitted by the Kellys on this point was a sports medicine article indicating that Tara's ankle fracture was one of the most common types of softball injury. *See* David H. Janda, M.D., *Softball Injuries* (Institute for Preventative Sports Medicine 1996)(71% of all injuries to softball players result from slides; 6.8% of all softball injuries are ankle fractures); *see also Roska v. Town of Cheektowaga,* 251 A.D.2d 984, 674 N.Y.S.2d 545, 548 (1998)(Wisner, J. & Balio, J., dissenting)("71% of all softball injuries sustained by players result from sliding into a base")(citing Janda, Wild

137. It was not necessary for defendants to prove that the Kellys had prescient knowledge of the precise accident and injury that occurred. The "specificity, particularity, and magnitude" of risk that must be shown to establish knowledge and appreciation of the risk "refer to the scope and source of possible dangers." *Tavernier v. Maes,* 242 Cal.App.2d 532, 51 Cal.Rptr. 575, 582 (1966). " 'It suffices if it is known to be within the range of possibilities; neither sure nor necessarily apt to happen; but one that will happen if the conditions are ripe for it.' " *Id.* (citation omitted). If there was no dispute as to whether a reasonable person in their respective circumstances must have been aware of the dangers in defending against a sliding base runner, summary judgment was appropriate. *See, e.g., Rosenblatt v. Kahn,* 245 A.D.2d 438, 666 N.Y.S.2d 666, 667 (1997)(affirming summary judgment against experienced softball player who "assumed the risk that he might be injured by a sliding opposing player").

In support of their motion, the defendants submitted evidence that the Kellys knew, as any reasonable person with their respective experiences in the sport would have, that Tara could be hurt during the tag-out play that she would be called upon to execute at second base. The circuit court correctly noted that sliding is an integral and well known part of softball and baseball. Though there is no direct Maryland authority recognizing that fielders and base runners assume some risk of being injured in a tag-out and slide, there is ample persuasive authority for this common sense proposition. *See, e.g., Martino v. Vonnes,* 298 A.D.2d 505, 748 N.Y.S.2d 512 (2002)(experienced second baseman injured when defendant slid into him "assumed the risk that he might be injured by a sliding opposing player"); *Picou v. Hartford Ins. Co.,* 558 So.2d 787, 790–91 (La.Ct.App.1990)(same); *cf. Totino v. Nassau County Council of Boy Scouts,* 213 A.D.2d 710, 625 N.Y.S.2d 51, 52, *cert. denied,* 86 N.Y.2d 708, 634 N.Y.S.2d 442, 658 N.E.2d 220 (1995)(minor plaintiff who was aware that

---

& Hensinger, *Softball Injuries—Aetiology and Prevention,* 13 Sports Med. 285 (1992)).

"[s]liding into base is an integral part of the game of softball" assumed the risk of sliding injury).

Indeed, there is no dispute that the tag-out play at issue here **required** the type of physical contact that we contemplated in *Hammond.* When there is no force play, the only way to defend second base against a base runner is for the fielder to tag the runner. Tara testified that she knew from growing up with the game that she had to tag the runner to get the out. This is a routine, if not easily executed, play in both softball and baseball; it is a potentially dangerous but integral part of the game.

Moreover, the Kellys must have understood that base runners would be likely to slide into second base. It is common knowledge to players and fans alike that, in order to avoid being either hit by the ball thrown to second or tagged by the fielder, the base runner usually slides.[14] Sliding in these circumstances not only increases the runner's prospect of a successful steal under the tag, but it also protects the vulnerable fielder from more serious injury that might occur if a stand-up runner collided at full speed into a fielder just as she extended her arm to catch the ball or reached toward the runner to make the tag. For this reason, sliding is often considered to be a necessary safety precaution.

That conclusion is reflected in *Picou v. Hartford Ins. Co.,* 558 So.2d 787 (La.Ct.App.1990). There, a second baseman suffered an ankle injury when a base runner dove or slid into her as she tried to tag the bag for a force out. The court held that the risk that a base runner would collide with her while sliding into second was inherent in the game of softball. *Id.* at 790.

"The closer the play, the more likely a collision; and the runner is not obliged to sacrifice himself or "surrender" an out by running outside the line to avoid collision with a

---

**14.** Many leagues, including the CYO, allow sliding in an attempt to legally avoid a fielder attempting to tag out the runner. Moreover, the penalty for failing to make an attempt to avoid a fielder who is in the immediate act of making the tag may be that the runner is called out.

fielder.... Accordingly, the closer the play, the more wary and self-protective the fielder must be to catch the ball while in contact with the base so as to remove himself with dispatch[.]"

*Id.* at 790–91 (citation omitted). The injury was simply an "unfortunate result of two women who played the softball game competitively and . . . with diligence." *Id.* at 791. *Cf. Bourque v. Duplechin,* 331 So.2d 40, 42 (La.Ct.App.), *cert. denied,* 334 So.2d 210 (1976)(inherent risks of softball include risk of "standing in the base path and being spiked by someone sliding into second base[,]" but not having the base runner run full speed into second baseman standing outside base path by five feet).

The summary judgment record here similarly shows that Tara and her parents understood that players trying to reach second base might be sliding toward Tara as she was trying to catch the ball and make the tag. Tara acknowledged generally that she was aware that "it was possible that you could get hurt playing the game[.]" She was a veteran second baseman, having played that and other infield positions for St. Mark's in previous CYO games. Thus, the slide and tag-out play, and its inherent risk for fielders, had been a routine part of the games that the Kellys watched, played, and prepared for.

We agree with the circuit court that, given the Kellys' experience and familiarity with the sport as it is commonly played, they must have understood and appreciated the danger that Tara could be hurt as she tried to tag out a sliding runner. There was undisputed evidence here that Tara and her parents knew that base runners would be sliding into second as Tara tried to tag them out, that they appreciated the obvious risk of injury in that play, and that they knowingly assumed it by choosing to play the game. The deposition testimony of Tara, her father, and her coach established that Tara had played and trained at second base. She and her parents understood that a second baseman must know how to position herself so that she can safely defend the base against a sliding runner. Tara's coach testified that she instructed her infielders not to place themselves in a base runner's path

and, more specifically, not to place a foot on the runner's side of the base. For safety reasons, she trained them to place their feet in front of, behind, or on the far side of the base. Similarly, Phillip Welch testified that he spent considerable time instructing and training his players during regular sliding drills.

The Kellys did not rebut that evidence. There was no evidence to refute Welch's testimony that he trained Amy G. how to slide safely into second base feet first. Significantly, the Kellys offered no evidence that Patricia Brady or anyone else associated with CYO, St. Mark's, or the Archdiocese told her that, in order to get the out, she had to touch the base as well as tag the runner. Tara notably did not dispute Coach Brady's description of her specific training of Tara and other infielders in how to avoid dangerous contact by keeping her foot away from the side of the base facing the sliding base runner. Nor did she deny that she received second base fielding instruction from Brady's daughter. Nor could she claim that this tag-out play was a new experience for her.

The only evidence that the Kellys offered to dispute the testimony that Tara received instruction and training in how to field when a runner is approaching second base was the awkwardly worded affidavit that the Kellys filed in opposition to summary judgment. In that affidavit, Tara states only that it "is apparent" that her coach did not train her "in the 'rules of softball' " and that she "did not know the actual rules of softball," because she "thought [she] had to keep [her] foot on the base in order to tag out a runner." This was a combination of vague generality (*i.e.*, her coach "apparently" did not train her in "the rules") and impermissible speculation (*i.e.*, the fact that she misunderstood the rules must mean that her coach did not give her the right instruction). What it is not, however, is admissible evidence of a matter within Tara's personal knowledge. *See Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 386–87, 693 A.2d 370 (1997).

At this stage of the litigation, Tara's inability to offer any evidentiary link showing that her misunderstanding of the rules was directly attributable to one or more of the defendants, rather than to another source (such as herself or her family), was fatal to her inadequate training claims.[15] Tara was an experienced second baseman who had a long familiarity with the sport. Given the obvious danger involved in this play, she must have understood not only that danger, but also that, if she needed further instruction on the "rules of softball" pertaining to it, she could and should ask questions before taking the field.

*Vendrell v. Sch. Dist. No. 26C*, 233 Or. 1, 376 P.2d 406 (1962), is instructive on this specific coaching issue. A high school football player who suffered neck injuries when he was tackled in a game sued the school district, complaining that the coach failed to provide adequate instruction. Citing the player's extensive training, practice, and play, the Oregon Supreme Court observed that

> [n]o one expects a football coach to extract from the game the body clashes that cause bruises, jolts and hard falls. To remove them would end the sport. The coach's function is to minimize the possibility that the body contacts may result in something more than slight injury. . . . The purpose of the extensive instructions and arduous practice was to enable the player not only to make for his team the maximum yardage but also to reduce to the minimum the possibility that an injury would befall him.

*Id.* at 413. The court specifically rejected the athlete's argument that the coach was negligent because he "had not told

---

15. In ruling on a defense motion for summary judgment, we must construe the facts, and all inferences reasonably drawn from those facts, in the light most favorable to the plaintiff. *See Crews*, 358 Md. at 644 n. 9, 751 A.2d 481. Under Md. Rule 2–501, however, summary judgment is appropriate if a defendant has submitted admissible evidence establishing that the plaintiffs cannot prove an element essential to their claim, and the plaintiffs do not raise a dispute of material fact with respect to that element. *See Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993).

him that if he used his head as a battering ram an injury might befall him." *Id.* at 413. Emphasizing that the coaches were the player's teachers, the court explained that sports instruction is not a one way street.

> **[The plaintiff] had the right—in fact, the duty—to ask the coaches questions concerning any matter which was not clear.** In turn, the coaches had the right to assume that he possessed the intelligence and stock of information of a normal young man[.] Thus, they had the right to assume that he knew of the possibility of injury that comes to an individual who uses his head as a battering ram.

*Id.* at 413–14 (emphasis added).

We decline the Kellys' invitation to hold that a coach may be held liable for negligent instruction based solely on the fact that the injured athlete claims that she silently misunderstood the rules governing a frequently occurring play in which the coach has given instruction and training. We also reject the Kellys' more general contention that, although they may have assumed the risk that Tara would be injured as a result of her own play or Amy's play, they did not assume that risk if the play was the result of negligent failure to instruct and train these athletes.

Coaches and leagues are not insurers of athletic prowess; they cannot be expected to train players in a manner that eliminates all dangers created by misplay, whether that misplay is caused by a young athlete's physical error or by her mental error.[16] It is no mystery to any coach, ball player, fan, or youth league parent that miscues on the field often reflect such mistakes. Thus, "the risks associated with *learning* a sport may themselves be inherent risks of the sport[.]" *Kahn,* 4 Cal.Rptr.3d 103, 75 P.3d at 40.

Sound public policy supports that conclusion. Much as they might wish otherwise, coaches cannot guarantee that their

---

**16.** Our disposition makes it unnecessary to address the Kellys' argument that there is a "special relationship" between coaches and players.

athletes will learn all the rules of the game, remember them in a game situation, and then properly execute the play according to those rules. It would unquestionably harm the sport to lay legal responsibility for an athlete's failure to understand a particular rule at the cleats of a coach who has offered that athlete time to learn the rule and to ask about it during practice and game situations. Indeed, if coaches and their sponsoring leagues can be held liable for a single player's unstated misunderstanding of rules governing a complex sport like softball, the type of instructional league that the Kellys joined may quickly become a thing of the past.

Case law and commentary also support our decision. We reviewed cases and treatises discussing the circumstances in which a coach has been sued for failing to prepare players to safely encounter specific physical dangers that commonly occur in a particular sport.[17] We found that inadequate instruction and training claims have progressed to trial only when a coach provided little or no training before asking the injured athlete to engage in a significantly dangerous play, and compounded that omission by failing to adequately supervise that play. *See, e.g., Leahy v. School Bd. of Hernando County,* 450

---

17. *See* Walter T. Champion, Jr., *Fundamentals of Sports Law* § 3.4, § 10.1 (Lawyers Coop. Publ. Co. 1990 & 2002 Cum.Supp.); 3 Gary A. Uberstine, ed., *Law of Professional and Amateur Sports* § 15.5, § 15.11, § 15.25 (West 2003); Stanley L. Grazis, *Liability of Participant in Team Athletic Competition for Injury to or Death of Another Participant,* 55 A.L.R.5th 529 (1998 & 2003 Supp.); Thomas R. Hurst & James N. Knight, *Coaches' Liability for Athletes' Injuries and Deaths,* 13 Seton Hall J. Sports L. 27 (2003); Andrew F. Beach, *Dying to Play: School Liability and Immunity for Injuries That Occur as a Result of School–Sponsored Athletic Events,* 10 Sports L.J. 275 (2003); Alexander J. Drago, *Assumption of Risk: An Age–Old Defense Still Viable in Sports and Recreation Cases,* 12 Fordham Intell. Prop. Media & Ent. L.J. 583 (2002); Lura Hess, *Sports and the Assumption of Risk Doctrine in New York,* 76 St. John's L.Rev. 457 (2002); Daniel E. Wanat, *Torts and Sporting Events: Spectator and Participant Injuries—Using Defendant's Duty to Limit Liability as an Alternative to the Defense of Primary Implied Assumption of the Risk,* 31 U. Mem. L.Rev. 237, 274 (2001); Howard P. Benard, *Little League Fun, Big League Liability,* 8 Marq. Sports L.J. 93 (1997); Anthony S. McCaskey & Kenneth W. Biedzynski, *A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries,* 6 Seton Hall J. Sports L. 7 (1996).

So.2d 883 (Fla.Ct.App.1984)(question of fact raised by evidence from which it might be inferred that football coach's lack of instruction, along with his failure to properly supervise and equip a young player, increased the risk of injury created by an agility drill that he designed).

Coaches generally have a duty to "instruct and train their players with respect to the fundamentals of the particular sport[,]" including teaching rules and skills necessary to the game, as well as methods to reduce the risk of injury. *See* Anthony S. McCaskey & Kenneth W. Biedzynski, *A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries*, 6 Seton Hall J. Sports L. 7, 23–24 (1996). But courts often apply the "inherent risk" limitation on the duty of care in rejecting negligent instruction and training claims. As the *Foronda* Court concluded, coaching cannot insure against certain risks that are inherent to a sport. *See Foronda*, 25 P.3d at 845.

Courts also often find that there is insufficient evidence to raise an inference that additional instruction would have avoided the injury. For example, in *Sanders v. Kuna Joint Sch. Dist.*, 125 Idaho 872, 876 P.2d 154 (App.1994), a student playing a recreational game of softball, in lieu of his usual weight lifting class, slid into first base, breaking his ankle. He sued the teacher and school district, asserting that he had not been properly instructed in how to play softball. Summary judgment was affirmed on causation grounds because there was no evidence that such instructions would have prevented the injury, which occurred during the inherently risky slide. *See id.* at 156–57.

A comparison with two cases in which summary judgment on a negligent training claim was held inappropriate provides instructive contrast with the Kellys' case. In *Taylor v. Massapequa Int'l Little League*, 261 A.D.2d 396, 689 N.Y.S.2d 523 (1999), a 10 year old Little Leaguer was injured when he slid into third base at his coach's direction. There was evidence that the boy was in his first year at the minor league division level, that the coach told the boy that he "had to slide into the

bases or else [he] would be automatically 'out[,]' " that the coach did so for the first time during the game in which the boy was injured, and that the coach had never given the team any instruction in how to slide. *See id.* at 524. From this evidence, an inference could be drawn that sliding was not an expected part of the game at this young level, so that the player and his parents may not have made an informed decision to assume the risk of a sliding injury. *See id.*

Similarly, in *Kahn v. East Side Union High Sch. Dist.*, 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d 30, 32 (2003), the California Supreme Court held that summary judgment was inappropriate against a 14 year old novice swimmer whose neck broke after her coach commanded her to dive into a shallow racing pool with no training or instruction. Long before that dive, the swimmer expressed to the coach her great fear of shallow water racing dives. The coach had allowed her to practice without doing these dives and promised her that she would not be required to do them at competitions. But at a swim meet, in the heat of competition, the coach told Kahn that she would be taken out of a relay if she did not do a racing dive. The court concluded that there were factual disputes regarding whether Kahn voluntarily encountered the risk.

Tara's injury did not result from an analogous lack of instruction or training. Tara was not injured during the type of specially designed practice drill that the Kellys might not have anticipated, or because she was required to perform a risky play for the first time, without prior notice or training. To the contrary, she was hurt during a routine game play that the Kellys knew was an integral part of the sport.

We need not decide the broader issue raised by the Kellys regarding whether an athlete can ever assume the risk of negligent coaching. Even if a coach might be held liable in some circumstances for negligently failing to give safety instruction and training, we agree with the circuit court that there could be no such liability in this instance. *Cf. Southwest Key Program, Inc. v. Gil–Perez*, 81 S.W.3d 269, 272

(Tex.2002)(similarly declining to decide whether "merely negligent" conduct is a sufficient basis for sports-tort liability because claim "fails even under the negligence standard").

There is no question that Tara participated voluntarily in CYO league play generally, and in the St. Mark's Parish v. St. Joseph's Parish game specifically. Here, the circuit court correctly determined that the defendants satisfied their summary judgment burden of showing that the Kellys must have understood the danger that a runner attempting to slide into second base could injure Tara, and that they also understood that proper training in the rules governing tag-out play was necessary to reduce the risk of Tara being injured. The Kellys' vague and speculative affidavit did not raise a material factual dispute regarding her claim of "failure to instruct." The defendants therefore established the necessary three elements of assumption of the risk. We hold that the Kellys assumed the risk that training and instruction would not prevent all mistakes that could result in injury on the base paths. *See Foronda,* 25 P.3d at 845; *Vendrell,* 376 P.2d at 413–14.

## B.

### Negligent Mismatching

The Kellys argue alternatively that the circuit court erred in holding that they assumed the risk of playing against "opposing players who were substantially beyond [Tara's] level of skill." They particularly complain that the court failed to make any independent analysis of whether Tara could have voluntarily agreed to play "an aggressive Marylanders player" like Amy G. We find no merit in the complaint.

"The duty not to place players in a non-competitive setting, otherwise known as the duty not to 'mismatch,' can be understood as a coach's responsibility not to pit players of unequal skill, size, weight, or strength against one another." McCaskey & Biedzynski, *supra,* 6 Seton Hall J. Sports L. at 36–37. The few cases we have found in which courts have ruled that coaches might be held liable for "negligent mismatching" only

underscore that this is not such a case.[18] For example, in *Tepper v. City of New Rochelle Sch. Dist.*, 143 A.D.2d 133, 531 N.Y.S.2d 367 (1988), a 130 pound rookie lacrosse player asserted a negligent mismatch claim against his high school after his coach required him to go one on one in a ground ball drill, against a 260 pound senior with three years of varsity experience. After the coach tossed a ball onto the field, both players sprinted toward it. The senior collided with Tepper, "use[d] an advanced '[checking]' technique to subdue" him, and in the process, broke his arm.

The appellate court noted that the coach segregated varsity players from the younger, smaller, and less experienced junior varsity players because "he believed the superior varsity skill level of play would be too advanced for inexperienced players[.]" *Id.* at 368. The coach also did not allow seniors to play on the junior varsity team, and restricted varsity to those players "with sufficient skill and physical prowess." *See id.* He also "routinely warned the smaller players about going head-to-head with a larger player." *Id.* "Based upon this unique factual scenario, [the court] conclude[d] that the plaintiff ha[d] raised an issue of fact as to whether the coach was negligent in permitting the ... player of slight build and very limited experience, to go head-to-head with the 260–pound senior varsity team member, a player possessing substantially greater experience[.]" *Id.* The court held that, "in light of this peculiar factual setting, it cannot be said as a matter of law that the plaintiff assumed the risk of injury." *Id.*

Tara was not injured in analogous circumstances. To the contrary, her injury occurred during a routine game situation, not a contact drill contrived by the coach, in which two particular players of grossly disparate size, physical ability, and experience were unnecessarily matched against each other.

---

**18.** *See generally* Drago, *supra*, 12 Fordham Intell. Prop. Media & Ent. L.J. at 602–03 (discussing mismatch cases).

The evidence here that there were more skilled and competitive players on St. Joseph's middle school team was not sufficient, by itself, to raise an inference that these two teams were unreasonably mismatched. We see no other evidence of mismatch in this record. To the contrary, according to Tara, even though St. Joseph's was one of the best teams in the league that year, St. Mark's was an average team, not "one of the worst." Even though Amy was a good player on a good team, according to Tara's coach, Tara was "one of the better" players on St. Mark's.

Tara and her parents knew that Marylanders players played on teams in the CYO league, including the St. Joseph's team. One of Tara's own St. Mark's teammates was a more skilled player who also played Marylanders ball. In addition, Tara admitted that she attended school with Amy Welch, who played for the St. Joseph's teams and Marylanders teams coached by her father, appellee Phillip Welch.

Furthermore, there was no allegation or evidence that Tara's injury resulted from any disparity in skill or aggressiveness. The Kellys have never claimed that Amy's superior talent or competitiveness caused Tara to misunderstand that she had to keep her foot on the bag while making the tag.

Moreover, we reject the Kellys' suggestion that recreational coaches and leagues have a duty to exclude more skilled players that are otherwise eligible by age and other objective criteria. That, too, would fundamentally alter the game. Uneven matches of player talent in sporting events are as common as lopsided scores. But they do not always dictate the outcome of a particular game, as any delighted coach can attest when a "David" player plays a pivotal role in a win over a team led by one or more "Goliaths." If recreational league coaches are pressured by liability threats to subjectively segregate "better" players from "average" players, instructional leaguers would lose the opportunity to play with and against more skilled players in an effort to improve their game to "the next level" demonstrated by the more skilled players. That

would defeat one of the primary reasons for instructional leagues.

From the objective perspective of a reasonable person, we also agree with the circuit court that Tara and her parents must have understood that she would be playing against better softball players who might be not only more skilled, but also more "aggressive" (whatever that subjective term may mean). We concur with the Supreme Judicial Court of Massachusetts that aggressive play and coaching are inherent and foreseen aspects of any organized team sport.

> Just as players are entitled to play aggressively without fear of liability, a coach properly may encourage players to play aggressively. Indeed, a coach's ability to inspire players to compete aggressively is one of a coach's important attributes. The mere possibility that some players might overreact to such inspiration or encouragement should not, by itself, suffice to impose liability on a coach.

*Kavanagh v. Trustees of Boston Univ.,* 440 Mass. 195, 795 N.E.2d 1170, 1179 (2003).

We shall affirm the judgment on the negligent mismatch claim in Count IV.

## II.

### Breakaway Bases

 " 'An invitee ... 'on the property for a purpose related to the possessor's business' .... is owed a duty of ordinary care to keep the property safe.' " *Rivas v. Oxon Hill Joint Venture,* 130 Md.App. 101, 109, 744 A.2d 1076, *cert. denied,* 358 Md. 610, 751 A.2d 471 (2000) (citations omitted). In Counts III and IX, the Kellys assert negligence and premises liability claims, alleging that all four defendants failed either to use the breakaway bases or to warn them about the hazards of stationary bases that are staked into the ground.[19] They argue that the record did not show that, at

---

19. In Count III, the Kellys generally allege that the Archdiocese, CYO, and both parishes negligently failed "to provide sports equipment that

the time of her injury, Tara or her parents knew and appreciated the risk posed by "the danger that existed as a result of [defendants'] use of stationary bases[.]" We again disagree.

The principles governing negligence, premises liability, and assumption of the risk apply equally to owners and operators of athletic facilities. In determining whether an athletic facility has violated a duty of care by allowing an athlete to encounter a dangerous condition on the playing field, we ask whether the condition was one that was either concealed or exceeded the usual dangers inherent in the sport. *See Morgan v. New York,* 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202, 208 (1997). Rephrased in the context of determining whether an athlete has assumed the risk of injury from the allegedly dangerous condition, we ask whether she knew about the condition and appreciated the risk it posed, taking into account her age and experience. *See id.*

Evidence that an athlete was familiar with the athletic facility, the condition of a field, the inherent risks of the sport, the existence of the allegedly dangerous condition, and the possibility of injury from it indicates that she has assumed the risk, even though there were other safety measures that the facility could have installed. *See, e.g., id.* at 421, 685 N.E.2d at 209 (veteran bobsledder assumed risk of injury from crash through opening in wall of bobsled run, given his experience in sport and on the particular sled run on which he was injured); *Mauller v. City of Columbus,* 552 N.E.2d 500, 503–04 (Ind.Ct. App.1990)(base runner who knew about uneven field conditions surrounding home plate assumed the risk of injury from catching foot on base); *Robinson v. Town of Babylon,* 166 A.D.2d 434, 560 N.Y.S.2d 507, 507 (1990)(second baseman

would be reasonably safe for use" in games. The only specific complaint, however, is that the second base on St. Joseph's field "was not a break away base, but rather, was designed to remain in a stationary position when struck with force." In Count XI, the Kellys assert a separate premises liability claim against the Archdiocese, CYO, and St. Joseph's.

assumed risk of injury from stationary base that shifted slightly as he attempted to make double play).

The defendants presented unrebutted evidence that the Kellys knew that the field was equipped with stationary bases. Tara routinely played on fields with stationary bases, including the St. Mark's and St. Joseph's fields. Daniel Kelly admitted that he had personally installed stationary bases on fields. He also knew that all of the CYO fields used stationary bases. Terry Kelly had "seen them in previous games put them in" and "assume[d] that it was that type of base since they had used it at all the other games." None of the Kellys knew that breakaway bases existed, or that St. Joseph's may have had breakaway bases available for use at the time of Tara's injury.

Given the Kellys' experience and knowledge that the fields were equipped with stationary bases, they must have understood that a sliding player could pin Tara's leg against the base. This was yet another obvious and well known risk inherent in the game.[20] They chose to let Tara take the field, and in doing so, assumed that open and obvious risk of injury. The fact that there may have been breakaway bases available and that the defendants may have known about them does not negate the Kellys' assumption of the risk, because the Kellys remained free to decline to participate based on their knowledge that the game would be played with stationary bases. *See, e.g., West v. Sundown Little League of Stockton, Inc.*, 96 Cal.App.4th 351, 116 Cal.Rptr.2d 849, 856, *cert. denied*, 2002 Cal. LEXIS 3610 (2002)(league had no duty to decrease risk of injury by providing players safety sunglasses so they would not lose baseball in the sun); *Balthazor v. Little League Baseball, Inc.*, 62 Cal.App.4th 47, 72 Cal.Rptr.2d 337, 341 (1998)(league did not have duty to provide face guards even if they reduced risk of injury from wild pitch, because failure to

---

**20.** For an example of a base-related risk that may not be obvious, see *Roska v. Town of Cheektowaga*, 251 A.D.2d 984, 674 N.Y.S.2d 545, 547 (1998)(issue of fact regarding whether base runner assumed risk of injury when slide caused stationary second base to detach from anchoring stake that speared runner).

do so did not increase inherent risk of being hit by wild pitch); *Fortier v. Los Rios Community College Dist.,* 45 Cal.App.4th 430, 52 Cal.Rptr.2d 812, 817 (1996)(no duty to provide safer football helmet because costs would reduce opportunity to participate in organized recreational sports).

*Md. State Fair & Agricultural Soc., Inc. v. Lee,* 29 Md.App. 374, 381, 348 A.2d 44 (1975), cited by the Kellys for our observation that, "[a]bsent proof of sufficient expertise, an invitee ... cannot be said to have fully appreciated certain dangers merely because he or she was aware of them," does not require a different conclusion. In that case, we were asked to decide whether a 24 year old horse exerciser assumed the risk of the fatal injuries that occurred when a runaway horse threw her onto a stone wall surrounding the Timonium race track barns. Based on the open and obvious nature of the track conditions and the decedent's riding experience at that track and others, we recognized that the decedent knew about the allegedly negligent track conditions. *See id.* at 379–81, 348 A.2d 44. We held nevertheless that the question of whether the decedent assumed the risk was properly submitted to the jury because there were disputes regarding both the appreciation and the voluntary exposure elements. *See id.* at 380–82, 348 A.2d 44.

With respect to the appreciation requirement, "the record [did] not show that the dangers posed by negligent conditions such as those alleged would be necessarily comprehended by 'any person of normal intelligence in ... [the decedent's] position.'" *Id.* at 381, 348 A.2d 44. With respect to the voluntariness requirement, the record showed that, "while [the decedent's] use of the track may have been 'voluntary' in one sense, it cannot be said Timonium was the 'choice' of" either the horse owner or the decedent, given that Pimlico race officials determined the location of each race entrant's training site. *See id.* at 384, 348 A.2d 44.

The Kellys' case is materially different. Unlike the Timonium track, the St. Joseph's diamond was an agreed upon field of amateur recreational play that day, as it had been on

previous occasions. Unlike the unusual risk of being thrown onto the perimeter wall outside the Timonium track, the risk of being hurt on the field during this play was so common that it was an expected part of the sport. Before Tara took her position at second base, all three Kellys knew that the field was equipped with stationary bases, and must have understood the danger of precisely what happened during this frequently occurring game situation—that Tara could be injured as a result of some misplay during a tag-out and slide.

## III.

### Post–Injury Care

In Count V, the Kellys allege that the Archdiocese, CYO, and both parishes negligently failed to train managers, coaches, and volunteer staff "to reasonably handle emergencies involving physical injuries to players during games." The circuit court pointed to undisputed evidence that both coaches on the field had received first aid training. It held that the Kellys (1) "failed to present even a scintilla of evidence that the [d]efendants breached their duty of care in the manner in which Plaintiff Tara Kelly was treated after sustaining an injury[,]" and (2) "failed to present admissible evidence that Plaintiff Tara Kelly's injuries were worsened when she was removed from the field or thereafter."

The Kellys challenge both holdings on a host of grounds, none of which explain why they failed to allege or offer evidence to show that Tara suffered injury as a result of the training that both coaches received for game injury emergencies. We agree with the circuit court that there is no evidence that Tara's injuries were either caused or exacerbated by any care that she received from these defendants, by any care that she did **not** receive from them, or by any lack of training in emergency care.

In particular, we reject the Kellys' argument that summary judgment was improper because Tara suffered some amount of additional pain as a result of being carried off the field and then transported to the hospital by her mother, rather than

being left on the field until emergency medical technicians arrived to take her by ambulance. We see absolutely nothing in this summary judgment record to indicate that there was any delay in Tara's treatment attributable to the manner in which she either left the field or traveled to the emergency room, or to a lack of emergency care training.

## Derivative Counts

Because Counts VI and VII of the Kellys' complaint were derivative claims for subrogation and reimbursement of medical expenses, we shall affirm those judgments as well.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**