912 A.2d 72

**Christopher COTILLO**

v.

**William DUNCAN et al.**

**No. 2859, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Dec. 6, 2006.

Kimberly A. Alley, Littleton, MA, Henry L. Belsky, Baltimore, for appellant.

Jason Beaulieu, Baltimore, Samuel Shapiro, Silver Spring (J. Michael Sloneker, on brief), Baltimore (Michael Mann, on brief), Towson, for appellee.

Panel MURPHY, C.J., EYLER, JAMES R., GETTY, JAMES S. (Ret., specially assigned), JJ.

Opinion by EYLER, JAMES R., J.

Christopher Cotillo, appellant, appeals from the grant of summary judgment by the Circuit Court for Calvert County in favor of the American Powerlifting Association ("APA"), William Duncan ("Duncan"), and the Board of Education of Calvert County ("Board"), appellees. Appellant's claims against appellees were all based on negligence. In granting appellees' motions, the court found that appellant assumed the risk of injury, and thus, appellant's claims were barred as a matter of law.

Appellant contends that the court erred in granting appellees' motions because assumption of the risk is a disputed material fact. We conclude that summary judgment was properly entered as to some claims but not as to all claims. Thus, we shall affirm in part and reverse in part.

### Factual Background[1] and Procedural History

On November 8, 2003, appellant was injured while attempting to bench press 530 pounds in the 2003 Southern Maryland Open Bench Press & Deadlift Meet (the "Meet"), a powerlifting competition sanctioned by the APA, and organized by Duncan, the faculty sponsor[2] of Patuxent High School's weightlifting club, and APA president, Scott Taylor ("Taylor"). The Meet was hosted by Patuxent High School in Calvert County, which operates under the jurisdiction of the Board. Appellant's injuries, including a shattered jaw, occurred on his third lift attempt, when, according to appellant, the " 'spotters' failed to grab [a]ppellant's lift bar when he was unable to successfully complete the attempted bench press lift," and the 530 pound barbell ("bar") fell, striking him in the jaw.

According to appellant, Duncan and Taylor were both responsible for organizing the event. As the local[3] organizer of the event, Duncan's responsibilities included obtaining the spotters to assist at the Meet. Duncan obtained Chris Smith ("Smith") and Chris Bair ("Bair"), Patuxent High School students, to act as "side spotters"[4] during the competition. Both Smith and Bair had spotted for Duncan in the gym before.

Duncan testified at his deposition that, on the morning of the Meet, he spoke with the spotters for "a few minutes" about "how things work in a competition." He stated that he told them "to keep their hands close [to the bar] but they

---

1. We shall summarize the evidence presented by the parties. Because this case was decided on motions for summary judgment, for purposes of disposition, we shall view the evidence in the light most favorable to appellant.

2. Duncan was also employed in a salaried position as a science teacher at Patuxent High School.

3. Duncan testified during his deposition that Taylor resides in Florida, so, because of proximity, Duncan was responsible for "setting up the facility."

4. Side spotters stand on opposite ends of the bar.

couldn't touch the bar because that would disqualify the lift." Duncan stated that he was the "hand off" [5] person for appellant's lifts.

During appellant's third lift attempt, Duncan handed off the bar to appellant and moved out of the judge's line of vision so that she could have an unhindered view of the lift. During the bar's descent to appellant's chest, Duncan heard a tearing sound. Duncan recalled that when appellant began to press the bar up, "his elbows flew like this and the bar came down, and at that point I reached out and I grabbed the bar."

Taylor testified at his deposition that both he and Duncan briefed the spotters before the meet as to "how to do it correctly." He said that he also instructed the lifters as to the "rules of performance" and told them that they were entitled to have their own spotters for the Meet. Taylor stated that he generally encourages lifters to use their own spotters, who are familiar with their techniques, because spotting is "mind reading," and having spotters who are familiar with the lifter "decreases the likelihood of anything . . . happening." Taylor stated that it was Duncan's job to get spotters for the Meet for those who did not have their own spotters, and Duncan told Taylor that he would get members of the high school powerlifting team to spot at the Meet. Taylor did not give Duncan any criteria or specific requirements for the spotters. There are no APA requirements regarding spotters that work at competitions. Taylor stated, however, that he would prefer spotters who have had experience around powerlifting.

Taylor was aware that Duncan had briefed the spotters before the Meet, but Taylor also briefed them, explaining to them safety aspects during the performance of a lift. He stated that he told the spotters to be "near the bar at least within six inches or so in case anything happens like what happened with [appellant] they get in there as fast as possible. At the same time they cannot touch the bar because it will

---

**5.** The "hand off" person assists the lifter by taking the bar off of the rack and handing it to the lifter before the lift and replacing the bar in the rack after the lift.

cause a disqualification for the lifter's lift.... [because] [i]t's considered ... assisting of the lift." He also instructed them that "if the lifter hesitates in the middle [of the lift] but there's no downward motion, don't just go in and grab it, that's when you wait, it's a referee discretion thing, they tell you to take the bar. However, if the lifter hesitates and they're on their way down, obviously you don't have to wait for the referee." He explained to the spotters that they should stay close to the bar because an accident can happen quickly, but also that they should not be so close to the bar that they accidentally touch it and disqualify the lift. Taylor said that at one point during the competition, with respect to a competitor other than appellant, and before appellant's accident, he observed one of the two spotters stepping "too far back away from the bar," and Taylor told him that he had to stay closer to the bar.

Taylor saw appellant's third lift attempt. In this regard, he stated that appellant "was given the command [to press], you could hear something rip, started coming up, I am just guessing four, six inches, it happened so fast. The bar started coming back and as it was coming back his wrists went like this (indicating) and everything was down. The spotters stepped in, grabbed the bar, but 530 pounds velocity you're going to get a downward motion no matter how big, how strong you are and that's where that happened (indicating)."

Smith testified at his deposition that at the time of the Meet he was fifteen years-old, approximately five feet eight or ten inches tall and 180 pounds, and he could bench press approximately 200 pounds. He had been weightlifting for approximately seven months prior to the Meet, and had been taught how to spot a bench press, although he had never spotted in a weightlifting competition before. Smith stated that sometime in the week before the competition, Duncan explained to him how to spot in the competition. Duncan also went to the gym with Smith during the "whole week" before the competition to show him "how to spot" and to "make sure" Smith knew what he was doing. On the morning of the Meet, Duncan practiced with Smith and Bair, and spoke with them for five or ten minutes about the rules of spotting in a competition. He told

them that they could not touch the bar until the judge indicated to do so or else the lifter would be disqualified. Smith said that when he spotted people in the gym, it did not matter if he touched the bar.

Smith testified that he, Bair, and Duncan spotted appellant during his lift attempts at the competition. The first and second lifts were uneventful. Smith stated that, during the third lift attempt, "the dude was lifting like 550, he was lifting a lot of weight, so Mr. Duncan said make sure you stay under the bar, but he was always saying make sure you don't touch the bar until [the judge] said so, or [appellant] would be disqualified." Smith testified that appellant lifted the bar about midway up and then stopped. At that time, Smith's hands were "[a]bout two inches" under the bar. Smith said that he was going to grab the bar, and he had an instinct to grab the bar about four seconds before he actually did grab the bar, but the judge did not tell them to, and he was afraid that appellant would be disqualified if he touched the bar. By the time the judge said something, it was too late. Smith had never spotted anybody bench-pressing in excess of 500 pounds before.

Bair testified at his deposition that at the time of the Meet he was in ninth grade, fourteen years-old, approximately six feet tall, and weighed 260 pounds. He stated that he had been weightlifting since eighth grade. Bair was taught how to spot in the school gym where he weightlifted. Before the incident, however, he had never spotted anyone lifting over 500 pounds and had never spotted anyone in a competition before. Bair stated that he had never taken any classes in weightlifting, never read any books or articles on weightlifting or spotting, and had never taken any classes about spotting.

At some point in the week before the competition, Bair had a conversation with Duncan about how to spot. Duncan showed Bair where to hold his hands, telling him they should be "no more than six inches away from the bar at all times, always keeping them underneath.... [with his] fingers ... laced so you get a better grip and it is hard to break through

it, the bar, in case it dropped." Duncan also explained to Bair when to touch the bar and what would happen if he touched the bar when he was not supposed to. Bair had never spotted anybody "[o]n the sides" before and had never spotted anybody lacing his fingers together. Duncan also had Bair practice by "getting used to the feel of the bar and picking it up, and if it dropped, how it would feel." On the morning of the competition, Duncan repeated the instructions that he had given Bair in the gym, and "wanted us to go over it" to "make sure we were doing it right." Duncan told Bair and Smith that "the only time we should touch the bar is when [the judge] told us . . . ." Specifically, Bair stated that Duncan "told us that what we should do is . . . if we feel like we need to help, is to put our hands under there and not to touch it until the judge tells us to . . . but keep it as close as we can and be ready for anything, because if he did, ended up not needing help and we were wrong, then they would get upset and we would get in trouble."

During the Meet, Smith and Bair spotted for lifters other than appellant. Prior to appellant's accident, Smith and Bair had to assist one or two of the other lifters with the bar. Smith stated that the people they helped were "struggling and as soon as the judge saw that they were struggling, she told us to go ahead and pick up the bar for them."

Bair stated that appellant's first two lifts were uneventful. With respect to the third lift attempt, Bair testified that appellant "had no trouble bringing [the bar] down. And he brought it up and he started having trouble, and that is when I started sliding my hands closer. And then the judge said grab it, and when we went to grab it, it was too late, and he dropped it all of a sudden, and we got there and picked it up as fast as we could." Bair said that he had an instinct to grab the bar "a couple seconds" prior to the time that he actually did grab it, but he did not because the judge told them not to touch the bar unless she instructed them to do so.

Emily Roberts, a friend of appellant's, videotaped the Meet for appellant on her digital camera. She filmed all three lift

attempts. After his second lift, and before his third attempt, appellant reviewed the video. He testified at deposition that he observed nothing out of the ordinary. He also testified that he had no difficulty with any of the spotters during his first two lifts.

Appellant testified at deposition that he had been powerlifting competitively since approximately 1994. From 1994 through 1999, appellant competed in between 15 and 20 competitions at the local, national, and international levels, and won awards at most of the competitions. He won a gold medal at the World Games in Sweden in 1999. Appellant was aware that there are certain risks associated with the sport of powerlifting such as pulled or strained muscles. He stated that if a powerlifter "was failing on a lift and there were no spotters and [the powerlifter] couldn't stop the weight ... it could be a dangerous situation." He said, however, that he had never seen anyone injured while doing a bench press, and had only once seen someone drop the bar on his chest while bench pressing. He couldn't remember if the individual had spotters, but didn't believe that he did.

On appellant's third lift attempt, he was trying to break a record by lifting 530 pounds. To this end, he was wearing a "Karin's Xtreme Power" double denim bench shirt, a shirt that is designed to allow a person to lift a significant amount more weight than he could lift without the shirt.[6] Appellant had worn this type of shirt before in competition and had experienced "blow outs," where the shirt rips from neck to sternum, twice before, but both times the spotters were able to grab the bar before it fell. Appellant said that "[w]hen the shirt blows you no longer have the shirt assisting you in the lift," and without that assistance, the powerlifter is essentially left doing a raw bench press of approximately 150 pounds more than he

---

6. The APA and Board filed third party complaints against Karin's Xtreme Power, LLC, the seller of the shirt, alleging that the shirt was defective when sold, in design, manufacture and warning, and the tear in the shirt contributed to appellant's injury. Later, APA and the Board voluntarily dismissed the complaints.

can usually do raw.[7] To keep the weight "from coming down and crashing on top" of the powerlifter in this situation, spotters are necessary. Appellant stated that, generally, when he wore the shirt in the gym for training, "[c]ertain guys had to be in [the gym] to spot" him because he was lifting heavy weight and he wanted to be sure that whoever was spotting him could stop the weight if the need arose. Appellant stated that before the Meet, Duncan told him that the spotters at the Meet "were members of the Patuxent High School powerlifting team. . . ." Appellant believes that the shirt tore slightly, but did not blow out, during his third lift attempt. He stated he did not know the shirt had torn until after his lift attempt had failed, and he did not know why the attempt had failed.

Appellant described his third lift attempt as follows.

Q. Let's talk about the third lift in particular. Where were the spotters positioned from the time that you sat down till the time that the bar fell?

A. Well, to the best of my knowledge, I mean I'm concentrating on the lift, I had one at each side and I had Bill [Duncan] lifting off and at the head of me. And, you know, I'm not trying to be smart or anything but you keep saying the bar fell and the bar never fell, I had a hold of the bar the whole time.

Q. Tell me what happened. Just take me step by step through the lift starting from when you sat down till the accident.

A. I was given—I lifted the bar off with [Duncan's] assistance, I was told to start the lift. I came down to my chest, paused it on my chest, he told me to lift. As I'm lifting I'm coming up and I got to about here, and I got to a sticking point where I couldn't press anymore, and from the best I can remember the bar started coming back down. And I

---

7. Appellant stated that he was able to bench approximately 450 to 460 pounds raw, and with the shirt on, he was able to bench about 600 pounds.

heard crunching which was my teeth, I felt the bar hit my chin and then it was picked up off of me. . . .

\* \* \*

Q. How far up from your chest did you get the bar before you stalled out?

A. To the best of my knowledge and what I can remember . . . I got it about halfway, I would say about here [indicating approximately six to ten inches off of his chest].

\* \* \*

Q. Do you know why the bar fell towards your face?

[Counsel for Karin's Xtreme Powerwear]: Objection. I think he testified earlier the bar didn't fall.

Q. Do you know why the bar went down towards your face?

A. No.

\* \* \*

Q. When the bar came towards your face at what point did the gentleman [sic] on either side of the bar, the spotters, at what point did they first touch the bar?

A. I have no idea. You know, I'm trying to get the weight up. As the bar is coming down for a split second I'm thinking they're going to grab the bar and the next thing I know I'm eating it. . . .

\* \* \*

Q. Now, in this incident in the APA lift when you got hurt you've shown us, you've demonstrated on your body, that you had gotten the bar approximately anywhere from six to ten inches, according to the estimates around the table, off of your chest and you couldn't get it any higher; is that correct?

A. Yes.

Q. All right. Did you say anything at that point?

A. No.

Q. Did you ask for any assistance at that point?

A. You pretty much can't ask. I mean you're pushing heavy weight. You can't. No, I did not.

Q. It's impossible—what you're saying when you say you can't, it's not that you're not allowed to, you're just not able to; is that what you're saying?

A. Well, I mean I'm still fighting the weight. Even though it's coming down on me I'm still thinking I can try to get it, get it and I'm still fighting it, and the next thing you know it's on top of me.

Q. Now, would you describe the incident as it happened from that point on, when you got it to the maximum elevation to the point where it struck your chin would you describe that as something that happened gradually or very quickly.

A. Quickly.

Q. It was almost instantaneous, wasn't it?

A. Yes. Well, I mean I was—it didn't fall, you know, I'm still fighting it, so as it's coming down I'm still fighting it. So it was quick but it wasn't like it was free falling.

Appellant testified that either the night before or the day of the Meet, he filled out a registration form and paid an entry fee. Appellant had signed documents containing release or waiver language at competitions in the past. Specifically, before he competed in the 2000 Southeastern Police and Fire Championships, which was not an APA sponsored event, he signed a release of liability, assuming "all risks in the games including, specifically (but not exclusively) the dangers of any malfunction of equipment, etc . . . ." Appellant did not remember this type of waiver language being on the form that he filled out before the APA Meet.[8]

---

**8.** This evidence is relevant to appellant's knowledge of the risk of injury attendant to the sport, although appellant testified to such knowledge independent of information contained in any documents.

In its initial motion for summary judgment, in addition to common law assumption of the risk, the APA argued that appellant's claim was barred by a written document in which appellant acknowledged risk of injury and agreed that APA assumed no liability for injuries. According to APA, the document was executed by appellant and was part of the application for registration, filled out by appellant on or before the morning of the Meet.

Appellant testified that before the Meet, he read the APA powerlifting rules. The rules provide, *inter alia*, that contact of the bar by the spotters between the referee's signals is a cause for disqualification of a bench press. Pursuant to APA rule VI.7., a spotter "shall not touch the lifter or the bar during the actual [lift] attempt. The only exception to this rule is if the lifter is in jeopardy and likely to result in injury, either at the request of the lifter, the center referee, or when it is very obvious to the spotter ... that the lifter will most likely be injured if the lift is to continue." Furthermore, "if the lifter is deprived of an attempt by an error of a spotter, and through no fault of his own, he will be granted another attempt if he wishes."

Mark Chaillet ("Chaillet"), appellant's expert, is the president of the International Powerlifting Association ("IPA"), a professional powerlifting association similar to the APA. Chaillet, a powerlifter for over 25 years, has trained others in the sport of powerlifting and in spotting.

During deposition, Chaillet testified that it is the practice of the IPA to instruct the spotters not to touch the bar "[o]nly in specific instances where the bar does not drop or where the athlete is not endangered." By affidavit, Chaillet attested that he had reviewed the video of the incident and concluded that the "spotters did not conform to accepted safety practices in spotting [appellant] and that, had they been properly trained and utilized the appropriate safety method in spotting, the injury to [appellant] would not have occurred as the spotters would have been able to control the bar prior to it impacting [appellant]." Chaillet stated that in all of his "years and experience in training and powerlifting," he had "never

There was some dispute, however, as to the authenticity of that document. Appellee APA was unable to produce the original document, and appellant's forensic document examiner testified at deposition that the copy provided was altered and/or manipulated. Appellee's document expert could not conclude with a reasonable degree of probability that the document had not been altered. Thus, appellee APA withdrew the purported waiver as a basis for its claim that summary judgment was appropriate, and we shall not consider the purported waiver in our analysis.

encountered a situation where the designated spotters failed to prevent a bar from injuring a lifter during an unsuccessful lift." Furthermore, at his deposition, Chaillet testified that in his opinion the spotters "were too far away from the bar to do any good," and that their positioning was "pretty much the same . . . in all three lifts." Chaillet conceded that the spotters prevented appellant from being killed.

Allan Siegel ("Siegel"), appellees' expert, and a powerlifter for more than 26 years, testified at deposition that, based on what he saw in the video, it was his opinion that the spotters did their job correctly. He stated that in his opinion, "they reacted as quickly . . . as they humanly could have." Siegel stated that on appellant's third lift, the bar did not go up—i.e., perpendicular to appellant's body—as it was supposed to, and as the spotters would have anticipated it to go, but rather "came back towards the face," making it impossible for a spotter to stop it from falling. He said that in a situation like that, "you're still talking of a human reaction time in a matter of a second or two. . . . It happens that quick (clapping hands)."

Siegel stated that he has trained spotters for meets, and in doing so would instruct them that their "job is the safety of the lifter, and if at any time you see the bar going down, grab it. Don't wait for a referee to tell you. If you grabbed it too soon, we can award the lifter another attempt. But you're there for their safety."

By affidavit, Siegel attested that based on his review of the depositions of Smith, Bair, Duncan, and Taylor, and the video of the incident, "the spotters were adequately selected, trained, and supervised. Although they were under 16 years of age, their size, experience in the weight room, and training from Bill Duncan and Scott Taylor made them valid candidates to spot at the [Meet]." Furthermore, Siegel stated that Duncan's "alleged statement to the spotters that they not grab the bar until the judges said so must be taken in context with the rules of bench press competitions, the APA's rules, and Scott Taylor's instruction that they could grab the bar if it

started to go down. Taken in context with all other rules and information given to the spotters and competitors, Duncan's alleged statement was correct in that it was meant to protect lifters from unnecessary disqualified lifts. Spotters generally are not permitted to grab a bar that is still rising or has stopped (without downward movement) because that will disqualify the lift." Siegel concluded that the video showed that appellant's third lift attempt was appropriately spotted and the spotters responded as quickly as they could, saving appellant's life.

We shall review the procedural history only to the extent relevant to the issues before us. In his complaint, appellant alleged that Duncan was negligent in failing to properly position himself as a spotter and in failing to properly position the other spotters and, generally, in failing to take appropriate safety precautions. Appellant further alleged that Duncan was acting as an agent of the APA and the Board.

Appellees filed motions for summary judgment asserting, in part, assumption of the risk. A hearing on those motions was postponed in order to permit two additional depositions, specifically, the depositions of Smith and Bair.

Subsequent to the depositions, appellant filed an amended complaint. Appellant included additional allegations of negligence, alleging that Smith and Bair were inexperienced, untrained, and inadequately instructed. Additionally, appellant alleged that Smith and Bair had been instructed not to grab the bar during a lift unless and until signaled to do so by the judge. Appellant alleged that Duncan was negligent in selecting inexperienced and untrained spotters, in entrusting the bar to them, and in failing to instruct and supervise them appropriately. Appellant also alleged that the APA and the Board negligently selected and retained inexperienced and untrained spotters and negligently entrusted the bar to the spotters. Finally, appellant alleged that the APA was liable as the principal of Duncan, Taylor, Smith, Bair, and the Meet judges, all of whom were negligent. The alleged negligent acts, underlying all of the claims, were (1) improper position-

ing of the spotters, (2) selecting and using inexperienced and untrained spotters, and (3) giving the spotters inappropriate instructions.

Subsequent to the amended complaint, the APA filed a motion to dismiss the negligent entrustment count. Appellant filed a motion for summary judgment, asserting that appellees were liable as a matter of law. Appellees did not re-file their motions for summary judgment.

On January 17, 2006, the court held a hearing on pending motions. By opinion and order dated February 3, 2006, the court held that appellant assumed the risk of his injuries and, thus, denied appellant's motion for summary judgment and granted appellees' motions for summary judgment.

The court's opinion follows.

[Appellant] is an accomplished powerlifter and holds local, national and international bench press records. He has been lifting competitively since 1994 and had competed in 15 other competitions prior to the Southern Maryland event. Prior to competing in the event at Patuxent High School on November 8, 2003, the [appellant] executed a release of liability in which he assumed all risks in the game.

"A voluntary participant in any lawful game, sport or contest, in legal contemplation by the fact of his participation, assumes all risks incidental to the game, sport or contest which are obvious and foreseeable." *Nesbitt v. Bethesda Country Club, Inc.*, 20 Md.App. 226, 232[,] 314 A.2d 738 (1974) as cited in *Kelly v. McCarrick*, 155 Md.App. 82, 841 A.2d 869 (2004). The usual and foreseeable dangers contemplated are those a similarly situated "player" would encounter. Foreseeable dangers include risk of injury resulting from the type of contact that is an integral part of the sport as it is typically played. *See Kelly*, 155 Md.App. 82, 97, 841 A.2d 869.

Powerlifting involves obvious foreseeable risks to all participants who voluntarily undertake the challenge of pressing more than two times their body weight while lying on a bench. [Appellant] and the experts deposed in this case all

agree there are inherent dangers in the sport of powerlifting. Because of the amount of weight being lifted, situations can turn seriously dangerous in fractions of seconds.

The [appellant] had two lifts leading up to his record attempt. Although he successfully completed the two previous lifts, all three attempts involved the same foreseeable risk—the weight falling on him. The fact that spotters are used indicates that an anticipated risk associated with powerlifting is the risk the weight could fall and injure the contestant. The opinion of the powerlifting experts deposed in this case was that the spotters "saved" [appellant's] life. Viewing the DVD recording of the failed attempt, *reasonable persons could not differ in concluding the speed at which the 530 pound bar came crashing down made prevention of the injuries impossible by human spotters.*

Furthermore, the more experience the [appellant] has in the sport, the more likely it is that he made an informed judgment regarding the inherent risks. *Id.* at 104, 841 A.2d 869. As stated previously, [appellant] was a very experienced powerlifter. [Appellant] alleges the spotters were trained improperly and acted negligently. During the event at which he was injured, he had two successful lifts prior to the failed attempt, all with the same spotters, using the same techniques. He did not question the competence or technique of the spotters. Based on his vast experience as a powerlifter and his ability to observe the spotters during the two previous lifts, it is clear [appellant] knew or should have known of the risks involved in attempting to lift 530 pounds.

The evidence in this case suggested the spotters, although young in age, were experienced weight lifters, had acted as spotters on numerous occasions in the weight room and were specially trained for this event. In addition, no evidence was presented to raise the inference that additional training of the spotters would have avoided the injury. *See Kelly* at 113, 841 A.2d 869. The injury occurred so quickly that prevention was impossible due to the constraints of human reaction time. The defense expert testified that the

spotter's performances were reasonable. The [appellant] urges the court to accept that if the spotters had acted on their initial gut instinct to grab the bar before the judge had signaled, he would have been spared the injuries in this case. This, however, is contrary to the training they received regarding the appropriate time to touch the bar. Had the spotters touched the bar prior to the signal, the lifter would have been disqualified. It was because of the specific training the spotters received for this official powerlifting event that they waited for a signal before assisting the lifter with the bar. These are the rules under which powerlifting is conducted and [appellant] was very much aware of these restraints from his prior experiences.

"Although the question of whether the plaintiff assumed the risk is normally for the jury, if it is clear that an individual of normal intelligence, in the plaintiff's position, must have understood the danger, then the issue is for the court." *Saponari,* 126 Md.App. at 32, 727 A.2d 396; *see ADM P'ship,* 348 Md. at 91–92, 702 A.2d 730; *Schroyer v. McNeal,* 323 Md. 275, 283–84, 592 A.2d 1119 (1991) as cited in *Kelly* at 95, 841 A.2d 869.

When viewing [appellant's] failed attempt, it is apparent that events unfolded so quickly that human response to prevent the [appellant's] injury was impossible. That is the nature of the sport and the risk one assumes when attempting to powerlift a record 530 pounds.

Appellant filed a motion for clarification as to whether the court's ruling extended to appellant's negligent selection and retention claims, contained in the amended complaint.[9] By subsequent order, the court clarified that its opinion and order disposed of all counts in the amended complaint.

## Discussion

### *Summary Judgment*

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is

---

9. There was no mention of the negligent-entrustment claim.

entitled to judgment as a matter of law. Maryland Rule 2–501. The purpose of the summary judgment procedure is to allow the court to decide whether there is an issue of fact sufficiently material to be tried, not to try the case or to resolve factual disputes. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219 (1994). A material fact is a fact that, depending on how it is decided by the trier of fact, will affect the outcome of the case. *Mandl v. Bailey*, 159 Md.App. 64, 82, 858 A.2d 508 (2004) (other citation omitted); *see also King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). In determining whether there is a genuine factual dispute, the trial court must view the facts in the light most favorable to the non-moving party and construe all inferences reasonably drawn therefrom in favor of that party. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 739, 625 A.2d 1005 (1993). Furthermore, if the evidence and the inferences therefrom are susceptible of more than one conclusion, the choice between those conclusions should not be made as a matter of law, but should be submitted to the trier of fact. *Goodwich v. Sinai Hosp.*, 343 Md. 185, 207, 680 A.2d 1067 (1996).

Appellate courts review an order granting summary judgment *de novo, Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707 (2002), to determine whether the trial court was legally correct. *Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993). To this end, in reviewing a trial court's grant of a motion for summary judgment, we review "the same material from the record and decide [ ] the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998). Our review includes a determination as to "whether there was sufficient evidence to create a jury question." *Saponari v. CSX Trans., Inc.*, 126 Md.App. 25, 37, 727 A.2d 396, *cert. denied, Saponari v. CSX Transp., Inc.*, 353 Md. 473, 727 A.2d 382 (1999) (other citation omitted).

## Contentions

Appellant contends that the court erred (1) in holding that appellant assumed the risk as a matter of law, and (2) in

entering summary judgment, *sua sponte*, with respect to the negligent selection and retention claims. We shall address the contentions in reverse order.

*Summary judgment, sua sponte*

■ Appellant observes that appellees did not refile or renew their summary judgment motions after appellant filed his amended complaint, and moreover, appellees asserted there was a genuine dispute of material facts in their responses to appellant's motion for summary judgment. Appellant argues that the court could not enter summary judgment, *sua sponte*, on the negligent selection and retention claims, which were asserted for the first time in the amended complaint.

Contrary to appellant's position, the court did have the authority to enter summary judgment in favor of appellees, assuming no motions by appellees, because appellant moved for summary judgment. *See Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 636, 698 A.2d 1167 (1997). All of appellant's claims were based in negligence, and assumption of the risk is a complete defense to all claims. *Crews v. Hollenbach*, 358 Md. 627, 640, 751 A.2d 481 (2000). We perceive no procedural error by the court, and we proceed to address the merits.

*Assumption of risk*

The question is whether, as a matter of law, appellant assumed the risk of the injuries he sustained.

■ Generally, a "plaintiff is said to have assumed the risk of injury when, with full knowledge and understanding of an obvious danger, he voluntarily abandons his right to complain by exposing himself to that particular risk." *Auto Village, Inc. v. Sipe*, 63 Md.App. 280, 293, 492 A.2d 910 (1985) (*quoting Kirby v. Hylton*, 51 Md.App. 365, 378, 443 A.2d 640 (1982)). The concept is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk. *Crews v. Hollenbach*, 358

Md. 627, 640, 751 A.2d 481 (2000) (citations omitted). Thus, the elements of assumption of the risk require that the defendant prove that the plaintiff "(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Saponari,* 126 Md.App. at 32, 727 A.2d 396 (*quoting ADM Partnership v. Martin,* 348 Md. 84, 91, 702 A.2d 730 (1997)). Furthermore, "[i]n the determination of these elements, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." *ADM Partnership,* 348 Md. at 91, 702 A.2d 730.

Usually the question of whether the plaintiff assumed the risk is for the jury, however, "if it is clear that an individual of normal intelligence, in the plaintiff's position, must have understood the danger, then the issue is for the court." *Saponari,* 126 Md.App. at 32, 727 A.2d 396. We note, however, that "[t]he question of a party's assumption of a risk should always be left to the trier of fact in all but the clearest of cases." *Auto Village, Inc. v. Sipe,* 63 Md.App. 280, 293, 492 A.2d 910 (1985) (*citing Hooper v. Mougin,* 263 Md. 630, 284 A.2d 236 (1971)). In order for a plaintiff to assume voluntarily a risk of danger, there must exist "the willingness of the plaintiff to take an informed chance." *Saponari,* 126 Md.App. at 35, 727 A.2d 396 *quoting Schroyer v. McNeal,* 323 Md. 275, 283, 592 A.2d 1119 (1991).

Recently, in *Kelly v. McCarrick,* 155 Md.App. 82, 841 A.2d 869 (2004), this Court reviewed the law of assumption of the risk extensively in the context of a sports injury. In that case, we held that a sports participant assumes all risks incidental to the sport which are obvious and foreseeable, i.e., the usual and foreseeable dangers that a participant expects to encounter. *Id.* at 96–97, 841 A.2d 869 (*citing Nesbitt v. Bethesda Country Club, Inc.,* 20 Md.App. 226, 232, 314 A.2d 738 (1974) (other citation omitted)). Stated differently, the risks assumed by participants in a game, sport, or contest, are only the " 'usual' and foreseeable dangers that a similarly situated player reasonably would expect to encounter" during

that game, sport, or contest. *Kelly,* 155 Md.App. at 96–97, 841 A.2d 869. The usual and foreseeable dangers include "risk of injury resulting from the type of physical contact that is an integral part of the sport as it is typically played," *Id.* at 97, 841 A.2d 869 (*citing Hammond v. Bd. of Educ. of Carroll County,* 100 Md.App. 60, 69–70, 639 A.2d 223 (1994)), as well as dangers that are "known to be within the range of possibilities; neither sure nor necessarily apt to happen; but one that will happen if the conditions are ripe for it." *Id.* at 106, 841 A.2d 869 (citation omitted). It follows that a participant does not assume an enhanced risk beyond what is inherent in the sport unless the participant has knowledge of facts that, applying an objective test, would charge the participant with knowledge of the enhanced risk. *See id.* at 104, 841 A.2d 869. These principles govern our disposition of this case.

 Assumption of the risk is independent of the duty owed by a defendant, but to apply the above assumption of risk principles and determine whether an enhanced risk existed, we must identify the particular risk. *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273 (1967) (assumption of the risk rests on the plaintiff taking a chance of harm from a "particular risk."). This means that, in order to identify the risk, we must identify those acts, supported by evidence, that appellant asserts constitutes negligence.[10]

A review of the evidence reveals that appellant's claims of negligence, including negligent selection and retention of the side spotters, rest on (1) improper positioning of spotters (Bair, Smith, and Duncan), (2) selecting and using inexperienced and untrained spotters, and (3) giving inappropriate instructions to the side spotters, that they were not to act without a signal from the event judge.

---

**10.** The question of whether any or all of the appellees owed a duty and were negligent is not before us. Assumption of the risk is based on a plaintiff's willingness to take a chance and is independent of a defendant's duty. *ADM Partnership,* 348 Md. at 102, 702 A.2d 730.

■ Applying the applicable principles to the evidence in this case, we conclude that appellant, given his admitted knowledge and experience, assumed the risk, as a matter of law, of being injured by the bar during a lift, under usual circumstances. This includes risks normally associated with spotters. The risk of a bar falling and seriously injuring the lifter, during a lift of heavy weights, is a risk attendant to the sport. Appellant acknowledged as much. Consequently, speaking generally, appellant assumed the risk that the spotters would fail to protect him in the event of a failed lift.

The risk attendant to the sport also includes differences in levels of training and experience by other participants and those involved in the sport. We do not have to decide whether and under what circumstances the lack of training and experience by persons involved in the sport, other than the plaintiff, gives rise to an enhanced risk. We only consider the specific risks generated by the evidence in this case. Putting aside generalities, insufficient to defeat a motion for summary judgment, the only specific risks generated by the evidence, regardless of whether they were causally connected to the spotters' lack of training and experience,[11] related to improper positioning and improper instructions.[12]

■ With respect to improper positioning by Smith, Bair and Duncan, the evidence indicates that appellant assumed the risk. This is because the evidence, the testimony of Chaillet, is that all three persons, who were to act as spotters, employed the same positioning during appellant's two prior lifts as they employed during the third lift. Additionally, appellant testified that he reviewed the video of the two prior lifts, and he had no difficulty with the spotters on the two prior lifts. While appellant also testified that he did not notice the positioning of the spotters on the prior lifts, he is charged with

---

**11.** Appellant focuses on the positioning of Smith and Bair, but also asserts that Duncan failed to properly position himself as a third spotter.

**12.** Appellant did not have actual knowledge of Smith and Bair's training and experience.

knowing what was clearly in front of him, both during the lifts and on video. Thus, appellant is charged with actual knowledge of the negligent positioning and chose to encounter the consequent risk.

We reach a different conclusion with respect to the improper instructions, concluding that they presented an enhanced risk, not normally incident to the sport. As stated previously, a person lifting heavy weights assumes that spotters may not prevent injury that occurs as a result of a failed lift, but the lifter does not assume the risk that a spotter has been instructed not to intervene until signaled to do so, even if the spotter perceives danger. Absent knowledge of any facts indicating that spotters had been given improper instructions, appellant did not assume the risk, as a matter of law, with respect to negligent acts causally related to such instructions and which were a proximate cause of the injuries.

Although an injured party will be held to have assumed even the enhanced, or non-usual risk, when the injured party had actual knowledge of the facts giving rise to the risk and voluntarily chose to encounter the risk, the evidence does not demonstrate that appellant had actual knowledge of the assumed improper instructions given to Smith and Bair, i.e., that they were not to touch the bar until signaled by the judge.[13] Smith and Bair testified that, as a result of the instructions given them, they did not react immediately when they perceived that appellant was in danger. Consequently, appellant did not assume the risk as a matter of law of claims based on the instruction not to touch the bar until signaled by a judge.

---

**13.** Appellant characterizes the testimony as just stated. It is clear that Smith and Bair were instructed that if they touched the bar during a lift, the lift would be disqualified. Our review of the testimony reveals that it is not so clear, however, that they were instructed not to touch it if they perceived danger. Nevertheless, we resolve all reasonable inferences in appellant's favor for purposes of addressing the issue before us.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–SIXTH BY EACH OF THE APPELLEES.